ANGELINE TAWEEL, *ET AL.*, PLAINTIFFS-APPELLANTS, v. STARN'S SHOPRITE SUPERMARKET, DEFENDANT-RESPONDENT.

Argued September 28, 1970—Reargued March 23, 1971—Decided May 10, 1971.

228

Mr. *Gerald R. Stockman* argued the cause for appellants (*Messrs. Dietrich & Stockman,* attorneys).

Mr. *Kenneth J. Dawes, Jr.* argued the cause for respondent (*Mr. Aaron Dines* on the brief; *Messrs. McLaughlin, Dawes & Abbotts,* attorneys).

The opinion of the Court was delivered by

FRANCIS, J. In late July 1965 plaintiff Angeline Taweel entered defendant Starn's Shoprite Supermarket in Absecon, N. J. to do some shopping. While pushing a grocery cart down one of the aisles in the area of the frozen foods section, she slipped on a quantity of what appeared to be melted ice cream on the floor. She fell against a food case but her son who was nearby caught her and prevented her from falling to the ground. She was immediately aware that she had hurt her back and reported the accident to an employee in a special booth to which she was directed for the purpose. It is clear from the record that she did make the report and that her description of the accident at that time substantially coincided with her testimony at the trial which took place almost four years later. Subsequently Mrs. Taweel instituted this suit against defendant Supermarket seeking damages for her injuries; her husband, George Taweel, joined in the action to recover for medical and hospital expenses and for his loss of consortium. After a six day trial in the Superior Court, Law Division, a unanimous jury awarded $32,400 to Mrs. Taweel for her injuries and $15,916.50 to her husband for his losses.

Later defendant moved for a new trial alleging certain trial errors and that the verdicts were excessive as well as contrary to the weight of the evidence as to liability. After argument, the court made an oral pronouncement which apparently was not clear as to the consequences intended because thereafter an order drawn by defense counsel was entered providing that unless Mrs. Taweel consented to a reduction of her verdict to $20,000 and unless her husband would accept a reduction to $3,300, a new trial as to damages only would be ordered. When plaintiffs refused to accept the reductions, defendant sought a correction of the order claiming its form was an inadvertent error. At argument the trial judge indicated that his original intention had been to order a new trial on all issues, liability as well as damages, if the wife would not remit the portion of her

verdict in excess of $20,000, and if the husband would not remit the portion of his verdict above $3,300. (That notion is, of course, a misconception of the remittitur practice.) However, since plaintiffs had declined the suggested reductions the judge revised the order, set aside the verdicts and directed a new trial as to both liability and damages. Plaintiffs sought to appeal therefrom but the Appellate Division denied such leave. We then granted plaintiffs' petition for certification. 55 *N. J.* 592 (1970).

The trial court's views necessitate a restatement of the true function of a remittitur. When there is adequate support for the jury's finding on liability and it appears only that the damages awarded were excessive, the remittitur device may be used and its use is encouraged to avoid a new trial. *Fritsche v. Westinghouse Electric Corp.,* 55 *N. J.* 322, 330–331 (1970). The term is used to describe an order denying defendant's application for a new trial on condition that the plaintiff consent to a specified reduction in the jury's award. *Fisch v. Manger,* 24 *N. J.* 66, 72 (1957). It may be employed only in cases where, if the plaintiff declines the reduction, the separate issue of liability having been clearly and properly decided, he must submit to a new trial as to damages. If, however, the award of damages is so grossly excessive as to demonstrate prejudice, partiality or passion and thus to generate the feeling that the entire verdict was tainted, a remittitur is improper. The correct procedure in such a case is an order for a new trial on all issues. So in the present matter, if the trial court concluded that the plaintiffs' verdicts were so grossly excessive as to infect the entire result and to visit a manifest injustice upon the defendant if allowed to stand, the remedy was an entire new trial.

This brings us to a consideration of the result that should have been ordered under the circumstances of this case. When the matter was argued originally, neither party furnished a transcript of the evidence. An evaluation of the trial court's action being impossible on such a limited record, we directed

that the testimony be added. This having been done and re-argument having taken place, we are satisfied that the issue of liability was fully and fairly decided by the jury and should not be disturbed.

Defendant produced no affirmative evidence as to the happening of Mrs. Taweel's accident. Its case consisted of a denial of all knowledge of the incident by the store manager and by his wife who operated the courtesy booth. But the circumstances strongly refute their disclaimer. Mrs. Taweel testified that the woman to whom she reported the mishap filled in a printed form with information about the accident and Mrs. Taweel's address. Later, she received from defendant a letter acknowledging that it had such a form and directing her to forward medical bills. In our view the evidence was ample to require the submission of the question of negligence to the jury for determination. See *Wollerman v. Grand Union Stores, Inc.*, 47 *N. J.* 426 (1966). If the jurors believed the plaintiff and her son, as obviously they all did, we see no rational basis on which a court should adjudge the verdict contrary to the weight of the evidence.

Turning to the plaintiffs' injury and damage claims as the jury could reasonably find them under the evidence, in our judgment the trial court erred in declaring that the verdicts were so disproportionate that to sustain them would constitute a manifest denial of justice under the law. *Fritsche v. Westinghouse Electric Corp., supra,* 55 *N. J.* at 330.

Mrs. Taweel was 46 years of age in July 1965. She was on the way to the seashore with her family when the accident happened. She realized immediately that her back had been hurt but continued on to the shore. However, the pain became so severe she had to return home in a few days and on July 23 visited her family physician, Dr. Andrew Ogden. Thereafter the doctor treated her frequently for pains in the lower back which radiated down her right leg, accompanied by numbness of the leg. He diagnosed her injury as a strain of the lower back with a suspicion of intervertebral disc injury. He administered heat treatments and prescribed

oral analgesics. After 14 unproductive treatments, Dr. Ogden called in Dr. Walter Scheuerman, an orthopedic specialist, who examined her on September 29, 1965. On October 6 he hospitalized her for several days in order to perform a myelogram, which, although it did not reveal a disc injury, resulted in headaches and nausea for several weeks. Then on October 18, Dr. Ogden, who did not regard the myelogram as conclusive, resumed heat treatments and injections. After 23 heat treatments which were temporarily palliative, on January 26, 1966 Mrs. Taweel began to see Dr. Theodore Podkul.

In July 1966 her back pain was so severe she "couldn't lie, stand, sit or anything," and on July 14 Dr. Podkul admitted her to Helene Fuld Hospital where she remained in traction until July 25. On her release Dr. Podkul referred her to another specialist, Dr. Michael Scott at Temple University Hospital. Fearful that Dr. Scott might order another myelogram, she refrained from seeing him until December 12, 1966. After examination, Dr. Scott recommended a back brace and a bed board.

On March 10, 1967 she began seeing Dr. Harry Urbaniak, an orthopedic surgeon, who gave her heat treatments, pain pills and injections. The pills and injections produced an adverse reaction and had to be discontinued. Following eight unproductive treatments, on July 17, 1967 Dr. Urbaniak again hospitalized her in traction for 10 days. This relieved the back pain somewhat, but on leaving the hospital she was given a larger back brace. Treatment was continued by Dr. Urbaniak at intervals, and in July 1968 she entered Temple University Hospital where she underwent tests. Apparently Dr. Scott wanted to take another myelogram but Mrs. Taweel said she "couldn't go through it again." After her release, however, she continued to experience pain and loss of ability to perform certain functions. As she explained:

I can't do my heavy work, I can't sit for any period of time, I can't bend much. If I bend I have to — they taught me how to bend,

I have to bend straight, * * * and I can't do — I love my gardening, I love painting which I can't do * * *; I can't lift * * * [or do] * * * any of my heavy work, my family has to help me.

She was employed fairly regularly in a school cafeteria during the period but the work entailed standing and no heavy tasks. Medical opinion favored some light work; failure to keep active, it was said, would actually cause a worsening of her condition.

Dr. Urbaniak continued to treat her throughout the remainder of 1968. He felt that she had a "bad lower back injury and that she had tremendous nerve root pressure which was due to lumbar disc protrusion." It may be noted that in spite of the negative myelogram, which they did not regard as conclusive, both Dr. Podkul and Dr. Urbaniak felt that Mrs. Taweel had a herniated lumbar disc. In December 1968, Dr. Urbaniak again referred her to Dr. Scott because of the persistent severity of the low back pain. The doctor recommended a second myelogram and, on receiving her consent, admitted her to Temple University Hospital where the myelogram was done on January 28, 1969. The confinement lasted nine days. This time the myelogram showed a "Herniated nucleus pulposus, L4, L5 interspace on the right."

Mrs. Taweel was still under Dr. Urbaniak's care at the time of the trial in May 1969. His last treatment had been given on April 21, 1969. At that time she was still experiencing pain and muscle spasm in the lower back. She was required to wear a special back brace and his prognosis was "guarded and poor." As he put it:

This condition has been present for a very long time and the longer the condition like this exists the more difficult it is to obliterate it. Personally, my opinion is she won't get any better. She will have bouts of very severe pain and at times it will decrease, and * * * [on treatment by] the deep heat and medication * * * it will subside; she will be a little better and a little worse and it will continue that way.

Q. For how long, doctor?

A. Permanently.

At the time of trial Mrs. Taweel had a life expectancy of 27 years.

Dr. Podkul could foresee no improvement in her condition without surgery, although he gave no opinion as to whether surgery would provide a remedy. Dr. Urbaniak felt that a patient who underwent lumbar disc surgery could improve, stay the same or worsen; "it's a tricky thing." An operation would require a two week hospital stay and a six months to one year period of convalescence, assuming there were no complications. The cost of the operation alone could be as much as $2500.

The evidence showed that prior to this accident Mrs. Taweel never had any trouble with her back. All of the treating physicians attributed her back pathology and its existing results to her accident in defendant Supermarket. Defendant produced one medical witness, a specialist in neuro-surgery. He saw the injured woman only once, on September 29, 1965 at Dr. Ogden's request. It was he who performed the first myelogram which he said was negative. It was his view that she suffered from a lumbosacral sprain rather than a disc injury. Although he would not "take issue" with Dr. Scott's diagnosis that the second myelogram showed a herniated disc, he did not think it was conclusive of the existence of such an injury.

Aside from the medical proof, testimony was offered to show the emotional as well as physical effects upon Mrs. Taweel. It was said without contradiction that her personality had changed since the accident. She had become nervous and high-strung and was irritable with her friends and family, as well as impatient with the children. Her husband George said that she has not driven a car since the accident and that he has to help her with her chores around the house and endure her complaints and irritability. As he put it, "it's hell to live with a woman that has" his wife's back trouble. Dr. Podkul described her as being "trigger sensitive" to pain and said that she had developed an "anxiety pattern" because of the long period of pain since her in-

jury. Defendant in its brief rather casually disparages her problems, saying it "feels that confusion of an admittedly emotional woman who did not bear up well under pain and suffering undoubtedly contributed mightily to the medical problem." If Mrs. Taweel is an emotional woman and constitutionally burdened with a low pain threshold, we know of no law which under the circumstances present here recognizes those conditions as a reason for mitigating her damage claim against the defendant.

■ A trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate to the injuries and resulting disabilities shown as to shock his conscience and to convince him that to sustain the award would be manifestly unjust. In making its overview, a court must accept the medical evidence in the most favorable light to the plaintiffs; it must accept the conclusion that the jury believed the plaintiffs' injury claims and the testimony of their supporting witness, and if, tested on such bases, the verdict (even if generous) has reasonable support in the record, the jury's evaluation should be regarded as final. *Fritsche v. Westinghouse Electric Corp., supra,* 55 *N. J.* 322.

■ Applying these concepts to Mrs. Taweel's verdict of $32,400, we have no hesitancy in holding that it is not excessive. There is ample support for the view that during the four years from accident to trial she suffered much pain and torment, physical and emotional. There were substantial indications that she will continue to do so throughout the remaining 27 years of her life expectancy, with only a speculative possibility of some relief if a successful lower spine operation is performed. The proof clearly justified a finding by the jury that her back problem was produced by a herniated intervertebral disc in her lower lumbar spine and that she will have severely limited motion and pain in that area for the rest of her days. Thus on the record here the trial court should have allowed the verdict to stand.

■ We are likewise of the opinion that the husband's verdict of $15,916.50 should not have been disturbed. At

the time of trial, the medical and hospital expenses to which he had been put totaled $3,072.52, with more to come in the future for palliative treatment. Aside from the actual expenses (which might be increased at some future time by $2,500 for an operation of uncertain results), it is obvious from the record that Taweel has suffered a serious deprivation of his wife's society and companionship as the result of her injuries. He has had to help her with household chores which require any substantial bodily effort. More than this, she has become high-strung, nervous and irritable, her personality has changed, and her relations with him and their children have deteriorated because of her impatience when in pain. As he put it poignantly at the trial after four years of experience, "it's hell to live with a woman that has" such a back condition. As noted earlier, his wife's life expectancy is 27 years. So long as he lives during that period, the jury could reasonably find that there is no relief in sight for him. In the face of his past experience and very little hope for surcease in the future, a claim that the jury's monetary evaluation represents a manifest injustice for defendant seems to be unrealistic.

We have considered the several trial errors asserted by defendant and find them to be without merit.

Accordingly the order of the trial court is reversed and the judgments of $32,400 for Angeline Taweel, and of $15,916.50 for George Taweel are reinstated.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For affirmance*—None.