756 A.2d 1037 (2000)
334 N.J. Super. 43
Danialie FERTILE, an infant, by her Guardian ad Litem, Marlene FERTILE, individually, and Ernst Fertile, Plaintiffs-Respondents/Cross-Appellants,
v.
ST. MICHAEL'S MEDICAL CENTER and Dr. Angela Buontempo, Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 2000.
Decided August 9, 2000.
*1039 George J. Kenny, Roseland, argued the cause for appellants/cross-respondents (Connell Foley, attorneys; Mr. Kenny, on the brief).
Cynthia A. Matheke, Roseland, argued the cause for respondents/cross-appellants (Lum, Danzis, Drasco, Positan and Kleinberg, attorneys; Ms. Matheke, on the brief).
Before Judges HAVEY, A.A. RODRIGUEZ and COLLESTER.
*1038 The opinion of the court was delivered by COLLESTER, J.A.D.
Following a jury trial in this birth trauma medical malpractice action, verdicts were rendered against defendants St. Michael's Medical Center and Dr. Angela Buontempo and in favor of the infant Danialie Fertile in the amount of $15 million and $3 million to her mother Marlene for her emotional distress. Defendants' motion for a new trial on liability was denied, but the trial judge remitted the damage award to $5 million for Danialie and $250,000 for Marlene. Plaintiffs initially accepted the remittitur. However, defendants appealed the verdict as to both liability and damages, and plaintiffs cross-appealed from the order of remittitur.
Marlene Fertile's labor began on June 23, 1994, at home. In the early morning hours of June 24, 1994, she went to St. Michael's Medical Center for delivery. She was in labor throughout the day. From about 6:45 p.m. to 9:15 p.m., the fetal monitor indicated that Danialie's heart decelerated during each contraction and returned to normal when the contraction ended. According to Marlene's physician, second-year resident Cecil Holgado, such decelerations were normal and posed no risk to the baby.
At about 9:00 p.m., Dr. Holgado noted that Marlene's cervix had stopped dilating, probably because the baby was bigger than a normal pelvis. Because labor was not progressing, Dr. Holgado concluded that delivery by caesarean section would be necessary. Assuming that Marlene's labor would not progress further, Dr. Holgado stopped administering a drug to induce contractions, explaining that once labor stops birth will not occur without surgical intervention. Because the baby showed no signs of distress, Dr. Holgado determined that there was no emergency *1040 and that the caesarean delivery could occur after he assisted with another caesarean delivery. He confirmed his decision with his supervisor, attending physician Debra Rosenzweig, and called Dr. Buontempo, a second-year resident, to observe Marlene.
Dr. Buontempo arrived sometime between 9:00 and 9:15 p.m. She reviewed Marlene's chart and examined her. She found that Marlene was fully dilated and that the baby was progressing into the pelvis with the top of the baby's head one finger width from the vaginal opening. This meant to Dr. Buontempo that labor was no longer arrested.
After 9:15 p.m., the fetal monitor changed. According to Dr. Holgado, who reviewed the tape at trial, this indicated possible compromise to the baby. Dr. Buontempo testified that if the baby's heart rate slows and does not quickly return to normal following a contraction, the oxygen supply to the baby is impaired. As a result the baby may experience hypoxia and suffer brain damage.
At 9:40 p.m., Dr. Buontempo observed that Marlene's labor had progressed, that she was fully dilated and that her baby had moved further down the birth canal. Because the baby's head was right at the vaginal opening, Dr. Buontempo concluded that a caesarian section was no longer an appropriate option and that the baby had to be delivered vaginally. Accordingly, she sent a nurse to the operating room to inform Dr. Rosenzweig, who along with Dr. Holgado was performing a caesarian section on another patient.
Dr. Buontempo summoned three nurses and a pediatrician for assistance. She recognized the potential that Danialie would be a large baby, given Marlene's obesity and her substantial weight gain during pregnancy. Large babies present a greater risk of shoulder dystocia, which occurs when the baby's shoulder is stuck against the mother's pubic bone and obstructed in its passage from the vagina.
Danialie was large, and her shoulder wedged behind Marlene's pubic bone. Dr. Buontempo freed the baby by changing Marlene's position, pressing down above Marlene's pubic bone and enlarging the surgical incision to expand Marlene's vagina. In the course of her birth Danialie was injured, resulting in an atrophied and partially paralyzed arm.
Plaintiffs' expert obstetrician, Dr. Stephen Leviss, testified at trial that by delivering Danialie vaginally rather than by caesarian section, Dr. Buontempo deviated from acceptable standards of care and that Danialie's injuries were proximately caused by that deviation. He said that Marlene had experienced an arrest of labor by 9:00 p.m. probably because the baby's size or shape prevented it from descending into the mother's pelvis, and that Dr. Holgado properly determined that a caesarian section should have been performed. He stated that women who have labored for eighteen hours without dilating sufficiently are unlikely to safely deliver vaginally because the mother's uterus is not contracting hard enough, either because the baby is too large or because it is improperly positioned.
Dr. Leviss explained that shoulder dystocia was abnormal labor in which the baby's shoulder became stuck after the baby's head had been delivered. During a contraction, the baby's head is pushed out of the vagina, stretching the neck. After the contraction, the head is drawn back into the vagina toward the stuck shoulders.
In Dr. Leviss's opinion the fetal monitor tracing through 9:30 p.m. was acceptable and indicated that the baby was in no danger. But when changes began to occur at about 9:15 p.m., the child should have been delivered by caesarian section.
Dr. Leviss opined that the changes in the fetal heart rate just prior to delivery resulted from head compression. In his opinion the distress shown in the fetal tracings was the result of Dr. Buontempo's attempts to deliver Danialie, as Marlene *1041 pushed and the nurse applied super-pubic pressure. According to Dr. Leviss, proper treatment would have consisted of relieving the head compression through a caesarian section or stopping the contractions "to get the patient to caesarian section to go back to normal because there's good variations with variability here."
Dr. Leviss maintained that, despite contrary statements in the medical records, the baby's head had not fully passed through the vagina. Nor did he believe the notation in the medical records that Marlene was fully dilated by 9:45 p.m. In his opinion the baby was two to three hours from delivery, and vaginal delivery should not have been attempted.
Moreover, Dr. Leviss testified that vaginal delivery was never an option because of the history of Marlene's labor. He said that Marlene's physicians should have anticipated shoulder dystocia and therefore delivered the baby by a caesarian section within a reasonable amount of time. He contended that a properly performed caesarian section would have prevented Danialie's injuries and been less risky for both Marlene and Danialie.
Dr. Sidney Wilchins, defendants' expert obstetrician, agreed that because labor was not progressing at 9:00 p.m., the decision to deliver Danialie by caesarian section was appropriate. However, he opined that once Marlene's cervix had fully dilated and Danialie had begun to move through the birth canal, the necessity for a surgical delivery was eliminated.
Dr. Wilchins interpreted the fetal monitor strips to reveal signs of fetal compromise. That is, the baby was experiencing an environmental insult that caused its heart rate to change and was incapable of overcoming the insult to return to a normal heart rate. He said that environmental insults could include such things as compression of the umbilical cord of the baby's head. In the face of such fetal compromise, Dr. Wilchins said that the physician's first obligation is to attempt to correct the situation by changing the mother's position to improve blood flow, to administer oxygen or to give the mother fluids. When these attempts at correction do not relieve the fetal distress, the doctor must deliver the baby as quickly and expeditiously as possible.
Dr. Wilchins said that by 9:45 p.m. the hospital record indicated that Danialie's head had reached the vaginal opening and that Dr. Buontempo acted "by the book" in proceeding to deliver Danialie vaginally. He added that had Dr. Buontempo postponed delivery until a caesarian section could have been performed or administered medication to slow the delivery, she would have been medically negligent.
Defendants' second expert obstetrician, Dr. Richard Luciani, agreed that Dr. Buontempo acted appropriately in Danialie's delivery and did not deviate from the standards of medical practice. He agreed with Dr. Wilchins that the medical records indicated that by 9:30 to 9:45 p.m. Danialie had begun to show signs of fetal distress. He stated that at the time the obstetrician must deliver the baby quickly. Attempting to slow labor or delivery at that point would constitute malpractice in his opinion. He also stated that a baby whose head has emerged from the birth canal cannot be pushed back to be delivered by caesarian section without causing severe damage to the mother as well as significant hemorrhage and trauma to the baby. He added that if a baby remains trapped in the birth canal for five or six minutes, the child is likely to be significantly brain damaged.
Pediatric neurologist Daniel Adler testified that as a result of traction on her head during birth some of Danialie's arm muscles are paralyzed and others are weak, resulting in a limited range of right arm motion. The condition is called a brachial plexus injury. Danialie is unable to move her right hand, thumb or fingers but can place something light in her right hand and hold it there. Her condition will not improve. However, social worker Michele Rennert suggested that additional gross *1042 and fine motor therapy could counteract the arm's atrophy and improve its appearance to render Danialie less likely to be ridiculed by other children.
Danialie has seen various specialists and had therapy for her arm. According to her mother, Danialie's arm has never moved. A five year old kindergartner at the time of trial, Danialie was disappointed and frustrated by her disability but had not been teased by other children. Marlene testified that Danialie required assistance with tasks that would ordinarily require the use of two hands, such as washing herself and combing her hair. Her father testified that Danialie could do nothing for herself and required assistance in brushing her teeth as well as washing, dressing, and feeding herself. While she was doing well in school she could not write well. The jury was shown a videotape of Danialie performing her daily activities, which was titled "Day In The Life of Danialie Fertile."
Ms. Rennert, the social worker, testified that Danialie was bright, self confident, exceptionally well spoken in both French and English, but required more opportunities for adaption and rehabilitation. She recommended counseling and education for both Danialie and her parents to help them understand her development and encourage them to properly impose discipline and normal limitations.
Career counselor Carole Miller testified for plaintiffs that in her opinion Danialie would have serious limitations in jobs that she could perform as an adult since most of the fastest-growing job fields required two hands. Directed by plaintiffs' attorney to assume that Danialie completed high school, Miller opined that, with only one hand, any job would be frustrating. Moreover, even if Danialie completed additional education, she would still be unable to perform required tasks in a field such as medicine. Finally, Miller added that a disabled person such as Danialie was more likely to encounter discrimination in hiring due to perceptions of reduced productivity.
In contrast, James Pascuiti, defendants' expert rehabilitation counselor, testified that although Danialie had limitations imposed by her arm, she was intellectually, socially, and physically able to attend regular school classes. He said that nothing suggested that she could not graduate from high school or pursue higher education to qualify her for a professional position. He predicted no income loss as a result of her disability.
We first address the issue of the recovery in favor of Marlene for her emotional distress. We note that a similar claim was pursued on behalf of Ernst, Danialie's father, but this claim was dismissed by the trial judge. Plaintiffs do not argue the issue on appeal as to Ernst but maintain that the jury award as to Marlene should be upheld.
To establish a cause of action for negligent infliction of emotional distress, a plaintiff must prove (1) the death or serious injury of another caused by defendants' negligence; (2) a marital or intimate familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress. Portee v. Jaffee, 84 N.J. 88, 101, 417 A.2d 521 (1980). These criteria apply to medical malpractice cases. Frame v. Kothari, 115 N.J. 638, 643, 560 A.2d 675 (1989); Giardina v. Bennett, 111N.J. 412, 419-20, 545 A.2d 139 (1988)(holding that medical malpractice causing an infant's stillbirth constitutes a tort against the parents).
Here, defendants contend that plaintiffs failed to prove that Marlene suffered the requisite degree of emotional distress as a matter of law.
The severity of the emotional distress raises questions of both law and fact. Thus, the court decides whether as a matter of law such emotional distress *1043 can be found, and the jury decides whether it has in fact been proved.
[Buckley v. Trenton Sav. Fund Soc., 111 N.J. 355, 367, 544 A.2d 857 (1988).]
In Carey v. Lovett, 132 N.J. 44, 58, 622 A.2d 1279 (1993), the Supreme Court recognized the unique relationship between mother and fetus and dispensed with any requirement that the mother be aware of the contemporaneous malpractice and injury to the fetus or be shocked by the result. However, the standard for recovery by the mother set forth in Carey is as follows:
[T]o prove a claim for emotional distress arising out of the injury or death of a fetus, the mother must prove that she suffered emotional distress so severe that it resulted in physical manifestations or that it destroyed her basic emotional security.
[Id. at 61, 622 A.2d 1279.]
In the instant case, Marlene testified that she felt "so bad" when she was told of her daughter's arm and when she saw her for the first time a few days later. Also testifying on the issue was Adney Suvil, Marlene's brother, who said that before Danialie's birth, Marlene was very happy. However, after the birth, she became sadder as Danialie's arm did not get better. He also said that Marlene had changed from attending a Catholic church to going to other churches hoping that God would cure Danialie's arm.
The limitation to severe emotional distress or to distress accompanied by physical injury is intended to ensure the genuineness of emotional distress claims, to preclude speculative damages, and to reflect the policy determination that compensation to the distressed parents must be balanced against the effects of expanded liability on the medical profession and on a society as a whole. Id.at 58-59, 622 A.2d 1279. "Although doctors should not be obligated to pay merely because something goes wrong, they should not be excused from compensating those who are injured by proven acts of malpractice." Frame, supra, 115 N.J. at 650, 560 A.2d 675.
In this case, no expert testimony was offered addressing the emotional repercussions upon Marlene of Danialie's injury. By way of contrast, in Portee, supra, 84 N.J. at 92, 417 A.2d 521, the proofs showed that the mother suffered significant emotional consequences including severe depression which required extensive counseling and psychotherapy. However, in this case the testimony adduced does not support a conclusion that Danialie's injury destroyed Marlene's basic emotional security, even though she certainly suffered shock and unhappiness. In proving a claim for emotional distress arising from a child's injury at birth, the parent must establish a level of emotional distress beyond that expected "when something goes wrong in the delivery room." Carey, supra, 132 N.J. at 62, 622 A.2d 1279. See also Gendek v. Poblete, 139 N.J. 291, 301, 654 A.2d 970 (1995).
We therefore determine that the evidence adduced herein was insufficient as a matter of law under Carey for recovery of damages for emotional distress by Marlene and that her claim should have been dismissed prior to submission of the case to the jury.
Defendants also argue that the damage verdict in the amount of $15 million for Danialie was so disproportionate to the evidence that a new trial on all issues is required. Carey, supra, 132 N.J. at 68, 622 A.2d 1279. See Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 231, 276 A.2d 861 (1971); Tronolone v. Palmer, 224 N.J.Super. 92, 98, 539 A.2d 1224 (App.Div.1988). Alternatively, they contend that the amount of damages ordered by the trial judge in remittitur was also excessive.
Plaintiffs assert that the damage award was not disproportionate considering the injuries suffered and that the remittitur should be reversed and the jury awards reinstated. Alternatively, they argue that if we find the damage verdicts *1044 disproportionate, the remittitur should be affirmed because there is no basis for a new trail on liability.
Following defendants' motion for a new trial under R. 4:49-1(a), the trial judge stated that the damage verdicts "took my breath away" and described the courtroom on receiving the verdict as being "in suspended animation" with apparent disbelief on the faces of both attorneys. She concluded that she could not "let the dollar amounts stand." However, she determined that the liability verdict was legally sustainable and factually sufficient and instead ordered the remittitur of $5 million for Danialie and $250,000 for Marlene respectively.
In reaching her determination of the appropriate amount of damages, the judge observed that Danialie's injury was devastating, visible, and life-long. Acknowledging that plaintiffs were unlikely to derive solace from the plight of more severely injured children, the judge found that Danialie was "precocious, bright, intellectually has the world open to her," but was subject to significant difficulties in daily life because she had only one functioning arm. Describing Danialie as a charming individual with a very visible disability, the judge observed the possible mental health impact of the disability and the likelihood that Danialie would require assistance in adapting to it. Further, because Danialie was just five, the damages award needed to consider a life expectancy of seventy-five years from the date of her injury.
It is well-settled that in determining whether to intrude upon a jury's damages award the trial judge is guided by the standard for the grant of a new trial set forth in R. 4:49-1(a), that is, whether a miscarriage of justice clearly and convincingly appears. As stated by Chief Justice Hughes in Baxter v. Fairmont Food Co., 74 N.J. 588, 596, 379 A.2d 225 (1977), "a trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate to the injury and the resulting disability as to shock his conscience and to convince him that to sustain the award would be manifestly unjust." See also Von Borstel v. Campan, 255 N.J.Super. 24, 28, 604 A.2d 614 (App.Div.1992). Because the jury's verdict is entitled to very considerable respect, the trial court may only overturn the verdict based on "a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence...." Baxter, supra, 74 N.J. at 597, 379 A.2d 225. Our standard on appeal is the same except that we give due deference to the trial judge's "feel of the case." Id. at 600, 379 A.2d 225.
In the case at bar, the comment of the trial that the verdict "took my breath away" cannot be dismissed as mere hyperbole, and her observations of reactions in the courtroom contributed to her obvious sense of "wrongness" about the verdict. This feeling of wrongness is well understood by experienced judges and trial attorneys although not subject to easy definition. Best stated by Justice Hall in State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964), the feeling of wrongness by the experienced reviewing mind must be "a definite conviction that [the jury] went so wide of the mark, a mistake must have been made."
While a jury has great discretion in measuring damages in a case of this nature, it cannot abandon its admittedly difficult task of analyzing the evidence to render a reasonable and proper economic award rationally related to the damages suffered.
The principal goal of damages in personal-injury actions is to compensate fairly the injured party. Deemer v. Silk City Textile Mach. Co., 193 N.J.Super. 643, 651, 475 A.2d 648 (App.Div.1984). Fair compensatory damages resulting form the tortious infliction of injury encompass no more that the amount that will make the plaintiff whole, that is, the *1045 actual loss. Ruff v. Weintraub, 105 N.J. 233, 238, 519 A.2d 1384 (1987). "The purpose, then[,] of personal injury compensation is neither to reward the plaintiff, nor to punish the defendant, but to replace plaintiff's losses." Domeracki v. Humble Oil & Ref. Co., 443 F.2d 1245, 1250 (3d Cir.), cert. denied, 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971).
[Caldwell v. Haynes, 136 N.J. 422, 433, 643 A.2d 564 (1994).]
We concur with the trial judge that the damage verdicts were excessive to plaintiffs and punitive to defendants. We next consider the question of whether the remittitur sufficiently dealt with the excessive verdicts or whether the damages awarded bespoke such prejudice, partiality or passion as to result in a miscarriage of justice requiring a new trial on both liability and damages.
Remittitur is a device used to deny defendant's application for a new trial conditioned on the plaintiff's acceptance of a specified reduction of the jury award. Its use is encouraged where there is adequate support for the jury verdict and only the damages awarded were excessive. Taweel, supra, 58 N.J. at 231, 276 A.2d 861; Fritsche v. Westinghouse Elec. Corp., 55 N.J. 322, 330-31, 261 A.2d 657 (1970). However, remittitur is not appropriate when the damages award is so grossly excessive that it suggests that the entire verdict was tainted by mistake, prejudice, partiality, or passion. Taweel, supra, 58 N.J. at 231, 276 A.2d 861; Rommell v. U.S. Steel Corp., 66 N.J.Super. 30, 49, 168 A.2d 437 (App.Div.),certif. denied, 34 N.J. 580, 170A.2d 544 (1961). In that instance the trial judge must resolve whether the taint permeated the verdict as a whole or only the damages award. Rommell, supra, 66 N.J.Super. at 49, 168 A.2d 437. Generally, when the damages are grossly excessive, the court must order a new trial on all issues. Taweel, supra, 58 N.J. at 231,276A.2d 861; Purpura v. Public Serv. Elec. & Gas Co., 53 N.J.Super. 475, 478, 147 A.2d 591 (App.Div.1959). This is especially true when the issue of the defendant's liability was not so clear and unmistakable as to yield the conclusion that the jury erred only in its assessment of damages. Rommell, supra, 66 N.J.Super. at 49,168 A.2d 437.
In the case at bar the magnitude by which the amount of the jury award exceeded any reasonable jury award strongly suggests that the jury verdict was tainted. Furthermore, the issue of Dr. Buontempo's liability was hardly clear-cut. The malpractice alleged was not that she was negligent in the actual vaginal delivery but that she negligently decided to proceed to a vaginal delivery rather than forestalling the process until the caesarian section procedure was performed. The expert testimony was very disputed as to whether the reason for a caesarian section still existed after observations of Marlene's dilation, the rapid descent of the fetus, and indications that the fetus was being deprived of oxygen.
Furthermore, there is an additional issue concerning the comments in plaintiffs' summation that Dr. Buontempo improperly interfered with the planned caesarian section and that any fetal distress resulted from Dr. Buontempo's efforts to deliver a disproportionately large infant. Plaintiff's counsel commented:
Those decelerations are a smoke screen and aand one that has such appeal that I ask you to consider it carefully. But I also ask you to consider thosecompare the decelerations, not numbered, not identified, not listed in Dr. Buontempo's post note, post-event note that she was instructed to write by Dr. Rosenzweig after, according to her testimony, Dr. Rosenzweig said didn't you know we wanted to do a section, please write it up. And ladies and gentlemen, I must submit to you that there was never any testimony from Dr. Rosenzweig, as was alleged in opening statement, that Dr. Rosenzweig told Dr. Buontempo she did the right thing.

*1046 ....
And then count those seconds up and ask if you, knowing what you now knowas I indicated from the beginning what you're going to know about birthing and so on, that that is such an ominous sign, or is it the only exit way out of this case for the defendants because it's clear from Dr. Rosenzweig's testimony that she came out of there preparing to section this woman and found a baby whose arm was hanging like this and said nothing more except document for the record, an hour later.

[Emphasis added.]
During defendants' opening counsel stated that Dr. Buontempo sent a nurse to advise Dr. Rosenzweig, who was performing another caesarian section, as to what had occurred and that what she was going to do. He also added that Dr. Buontempo later spoke with Dr. Rosenzweig and that Dr. Rosenzweig did not disagree with the decision for a vaginal delivery. Subsequently, plaintiffs objected to this portion of defendants' opening, arguing that because Dr. Rosenzweig had not been named as an expert witness and was not present during the birth she could not testify regarding her opinion of how Danialie should have been delivered. Defendants responded that plaintiffs were on notice because of Dr. Buontempo's deposition testimony about her post-delivery conversation with Dr. Rosenzweig. The trial judge reserved until Dr. Rosenzweig's testimony.
On direct examination Dr. Rosenzweig stated that she had no recollection of Marlene's labor and delivery, explaining that in a teaching hospital such as St. Michael's the attending physician supervised the residents in basic instruction and protocol but was "not involved in direct patient care." Her only recollection was that she had walked into the labor room after Danialie had been delivered and instructed Dr. Buontempo to write a careful chronology of the birth because of the complications.
On cross-examination the defense proffered the intention to ask Dr. Rosenzweig what she would have done given the dilation of Marlene's cervix and Danialie's position at 9:45 p.m. and that she would answer that she would have the baby delivered at that time. The trial judge sustained plaintiffs' objection to this testimony, stating that
There was a distinction in my mind between her involvement at the time and Dr. Holgado's. Dr. Holgado came into play because he made a determination having evaluated the other patient before he left to go to this other C section and that to me was veryvery relevant and very fair. This is notthis woman has indicated she had no involvement till after the fact. So now to ask her what she would have done at that point in time, is really going beyond the scope of any fact involvement that she had.
Plaintiffs assert that the summation comments were based upon Dr. Rosenzweig's statement that she told Dr. Buontempo to write a report because of the injury suffered as well as the following exchange on cross-examination of Dr. Buontempo:
Q. Now doctor, you got no answer from Dr. Rosenzweig when you sent in word that there was going to be a delivery.
A. No.
Q. You gotthat's correct, you got no answer.
A. I didn't get any answer.
Q. And did Dr. Rosenzweig indicate to you afterask you after the delivery whether you were aware that they were planning to do a caesarian section?
A. Yes.
The relevant testimony does not justify the comment that following Dr. Rosenzweig's completion of the other caesarian section Dr. Rosenzweig admonished Dr. Buontempo saying, "Didn't you know we wanted to do a section, please write it up." *1047 Nothing in the record supports a statement that Dr. Rosenzweig made any observation regarding the planned caesarean delivery. To the contrary, Dr. Rosenzweig maintained that she had no recollection of Marlene's labor or delivery other than instructing Dr. Buontempo to "write a chronology of the course of the delivery" in light of the complications associated with Danialie's birth. Dr. Buontempo did not testify to the contrary. Nor was there any testimony that Dr. Rosenzweig saw Danialie contemporaneously with her post-delivery conference with Dr. Buontempo or that, if she had seen Danialie, Dr. Rosenzweig would have observed her "arm hanging like this."
In the context of this close case on liability these misstatements as to Dr. Rosenzweig's testimony had great potential to mislead and inflame the jury because they suggested that Dr. Rosenzweig, Dr. Buontempo's superior, disagreed with the decision to carry out a vaginal delivery. Moreover, the representation that Dr. Rosenzweig admonished Dr. Buontempo supported plaintiffs' theory that Dr. Buontempo committed malpractice in not carrying out the previously planned caesarian section.
As plaintiffs note, there was no objection to the summation comments until the defendants' new trial motion so that the issue must be considered by the standard of plain error. R. 2:10-2; State v. Macon, 57 N.J. 325, 333, 273 A.2d 1 (1971). Counsel are afforded considerable latitude in their summation, but they are not at liberty to misrepresent or distort the evidence. State v. Bogen, 13 N.J. 137, 140, 98 A.2d 295, cert. denied, 346 U.S. 825, 74 S.Ct. 44, 98 L.Ed. 350 (1953); Diakamopoulos v. Monmouth Med. Ctr., 312 N.J.Super. 20, 32, 711 A.2d 321 (App.Div.1998). In this instance we find that the misstatements in plaintiffs' summation constituted plain error clearly capable of producing an unjust result and that the grossly excessive verdict was indicative of the prejudicial effects of the misstatements. See Henker v. Preybylowski, 216 N.J.Super. 513, 520, 524 A.2d 455 (App.Div.1987).
Therefore, based upon the grossly excessive verdict in this difficult liability case together with the misrepresentation of fact to the jury, a new trial is mandated on all issues relating to alleged malpractice as to Danialie. In light of our determination we need not address the other issues raised by defendants.
Reversed as to the complaint of Marlene Fertile. Reversed and remanded for new trial as to the complaint of the infant Danialie Fertile.