760 A.2d 348 (2000)
334 N.J. Super. 547
Rose IACANO, Plaintiff-Respondent/Cross-Appellant,
v.
ST. PETER'S MEDICAL CENTER, Carol Baab, R.N., and Ann Dennigan, R.N., Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 26, 2000.
Decided October 23, 2000.
Thomas F. Chansky, North Brunswick, argued the cause for appellants/cross-respondents *349 St. Peter's Medical Center and Carol Baab, R.N. (Mr. Chansky, of counsel; Margaret A. Mulligan, Kendall Park and Michael B. Lynch, on the brief).
William R. Lane argued the cause for appellant/cross-respondent Ann Dennigan (Johnstone, Skok, Loughlin & Lane, attorneys; I. Blakeley Johnstone, III, Westfield, of counsel; John Bensulock, Carteret, on the brief).
Richard J. Grodeck argued the cause for respondent/cross-appellant (Feldman Grodeck, attorneys; Mr. Grodeck on the brief).
Before Judges PRESSLER, KESTIN and CIANCIA.
The opinion of the court was delivered by CIANCIA, J.A.D.
In this medical malpractice case, defendants Baab and Dennigan, nurses employed by defendant St. Peter's Medical Center, were found to have deviated from accepted medical standards in the treatment of plaintiff Rose Iacano. Baab was found five percent responsible and Dennigan ninety-five percent responsible. The jury awarded plaintiff $1.5 million in damages which was subsequently reduced to $500,000 on defendants' motion for a new trial or, alternatively, a remittitur.
All defendants appeal contending that the verdict was against the weight of the evidence and the product of prejudice, partiality or passion. The alleged disproportionate allocation of responsibility between the two nurses is presented as indicative of an improper verdict that can be remedied only by a new trial. Plaintiff, although having accepted the remittitur, cross-appeals contending that the verdict award of $1.5 million was not excessive and should not have been reduced. Defendants' appeal allows plaintiff's cross-appeal. Fanoli v. Sea-Land Services, Inc., 251 N.J.Super. 443, 452, 598 A.2d 911 (App.Div.1991), certif. denied, 127 N.J. 557, 606 A.2d 369, cert. denied, 505 U.S. 1220, 112 S.Ct. 3031, 120 L.Ed.2d 901 (1992); Mulkerin v. Somerset Tire Service Inc., 110 N.J.Super. 173, 177, 264 A.2d 748 (App.Div.1970). We find, however, that there is insufficient merit in the appeal and cross-appeal to warrant a new trial or modification of the final judgment as reduced.
Iacano was being treated for non-Hodgkin's lymphoma as an out-patient at St. Peter's Medical Center. Every third Friday she came to the medical center to receive injections of various chemicals through an intravenous (IV) line. It was plaintiff's allegation that on one of those occasions the nurses negligently administered the chemotherapy and caused an extravasation in plaintiff's right hand with consequential severe injuries.
Extravasation is a term used to describe the escape of substances being injected into a blood vessel from the vessel into the surrounding tissue where they are then absorbed. This can be caused by a needle that has broken through a blood vessel. Extravasation was a concern in the treatment of plaintiff because two of the drugs being used in her chemotherapy were vesicantsi.e., drugs that could cause damage by irritation, inflammation and tissue destruction if they escaped from the blood vessel. A nurse who is administering vesicant drugs intravenously should look for a "good return of blood." This means that as the needle is drawn back, the tube connecting the needle to the patient's arm will fill with blood, indicating the needle is inside the blood vessel. However, an extravasation can occur even in the presence of a return of blood. Any complaint of pain by the patient should be responded to immediately. If there is evidence of extravasation, the IV should be switched to a different location.
Plaintiff's chemotherapy involved the use of four drugs, three of which were given intravenously and one orally. The three drugs given intravenously were Cytoxan, Oncovin and Adriamycin. The latter two are vesicants and are administered *350 via an "IV push." That term means that a nurse is present and physically injecting the drug into the vein. Cytoxan, on the other hand, is a non-vesicant and is administered through an IV drip. Plaintiff's procedure typically began with a nurse setting up the IV line and then, by IV drip, administering a combination of saline and an anti-nausea drug, Kytril. Thereafter, the Oncovin and Andriamycin are administered.
On December 2, 1994, plaintiff went to the medical center for her chemotherapy accompanied by Muriel Brady, a long-time friend. An IV line to plaintiff's right hand was started by Dennigan at approximately 12:15 p.m. and saline and Kytril were run through the drip. Plaintiff and Brady both testified that plaintiff twice complained of discomfort during this stage to Dennigan. Dennigan did not recall any such complaints and there was no log of those complaints having been made. Brady further testified that during this time plaintiff's hand appeared red, puffy and swollen.
After the saline and Kytril had been administered, Baab entered the room to perform an IV push of the Oncovin and Andriamycin. Baab testified that she got good blood return before injecting the vesicant drugs and that there had been no complaint of pain or indication of swelling prior to the commencement of the IV push. On depositions, Baab had indicated she could not remember if she had, in fact, inquired of plaintiff prior to the IV push how she was feeling. It was not part of Baab's practice to specifically ask if the patient was feeling any pain. The entire dose of Oncovin was administered and the Andriamycin was started when plaintiff complained of a burning sensation in her hand. At that point the IV was removed from her right hand and placed in her left, where the treatment was concluded without incident. Dennigan was apparently not present while Baab was conducting the IV push. The doctor on call at the time was notified that an extravasation had occurred while Andriamycin was being injected and he instructed that cold soaks be placed on the right hand. It is undisputed that extravasation had occurred and caused tissue damage in plaintiff's right hand. It was also uncontroverted that plaintiff had complained of a burning sensation and it was that complaint that caused the IV to be switched to the left hand. Nevertheless, the nurses failed to indicate this on their progress notes.
Plaintiff returned to the hospital the following Monday complaining of pain in her hand. She was seen by a doctor but no treatment was prescribed.
In early January plaintiff developed a temperature and came under the care of Dr. Joseph Leddy, an orthopedic surgeon, who testified via a videotaped deposition concerning the procedure he used to treat plaintiff's right hand:
Basically the name of the procedure was excision of the eschar on the dorsum of her right hand and the debridement of the wound. In English we took off that entire dead area of scab and scar on the back of her hand. We cleaned all the purulent material away by elevating the tissue and cleaning it out as much as we could, and we took away any tissue there that we thought was dead.
At that point in time it left her extensor tendons exposed and some other things exposed on the back of her hand. We couldn't skin graft it at that time because if you put a skin graft over an infected area, it's going to wash away. And, also, if you put the skin graft over exposed tendons, it won't take because the skin graft has to get its blood supply from underneath and up, and there's no good supply on those tendons.
So basically after cleaning this off, getting rid of all of the dead necrotic tissue that we could and cleaning up as much as the purulence as we could we put her in a big bulky dressing and planned to do that, told her we would *351 bring her back several days later to do it again.
Another debridement procedure occurred on January 20 involving the removal of necrotic tissue and purulence from the wound. From then until late spring 1995 plaintiff was required to change the dressings on the wound four times a day. The concern during this period was that the exposed tendons would desicate, resulting in an inability to extend the fingers. By April 1995, Leddy believed the wound was finally starting to show significant improvement. By October the wound had healed over on its own so that skin grafts were not necessary. Plaintiff testified to the severe pain she experienced during the post-event healing period. At the time of trial, plaintiff still suffered from daily pain, particularly during cold weather, and had limited use of her index and pinky fingers. She had difficulty sleeping many nights due to the discomfort. Leddy testified that plaintiff's soreness, scaring and lack of flexibility are all permanent.
Defendants contend that a new trial should have been granted because the verdict was against the weight of the evidence. Although Baab and Dennigan come at the proposition somewhat differently, they both essentially argue that the sharp difference in liability allocated between them demonstrates a jury verdict that was clearly mistaken. The amount of the verdict, they argue, was so extravagant as to demonstrate that the determinations on liability and damages should both be vacated and a new trial ordered. In their view, remittitur was an inadequate remedy.
As with most trials, some of the evidence was in conflict and witnesses' testimony was not always entirely consistent. Nevertheless, on the evidence presented, the jury could have reasonably found credibility in favor of plaintiff and Brady. Having done that, it then could have concluded that the vast majority of negligence was committed by Dennigan. Specifically, the jurors could have found that Dennigan was responsible for initially causing the extravasation, ignoring plaintiff's complaints and failing to realize that an extravasation had occurred, failing to switch the IV to the other arm, and failing to inform Baab of the complications. Baab, in turn, could have been found responsible for not sufficiently inquiring about the initiation of the IV or whether Iacano was experiencing any pain. In our view, there was a clear evidential base to permit the jury to find that Dennigan was responsible for the vast majority of the negligence. Accordingly, the allocation of liability is not indicative of a miscarriage of justice and a new trial was not warranted on that basis. R. 2:10-1; R. 4:49-1(a); Dolson v. Anastasia, 55 N.J. 2, 6-7, 258 A.2d 706 (1969).
Defendants also point to the amount of damages awarded by the jury as justification for a new trial. They argue the damages were so excessive as to indicate that the entire verdict was tainted with passion, prejudice and partiality. On cross-appeal plaintiff argues that the initial award of $1.5 million was entirely appropriate and should not have been reduced. In our view the trial judge correctly concluded that the jury's award was excessive, but not indicative of a mistaken evaluation of liability.
As to the question of excessiveness, our Supreme Court has said that a "trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate to the injuries and resulting disabilities shown as to shock his conscience and to convince him that to sustain the award would be manifestly unjust." Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 236, 276 A.2d 861 (1971). In other words, it must "clearly and convincingly appear that there was a miscarriage of justice under the law." Baxter v. Fairmont Food Co., 74 N.J. 588, 596, 379 A.2d 225 (quoting R. 4:49-1(a)). Jury verdicts should be found to be excessive and therefore reduced, only in "clear cases." Ibid. (quoting Fritsche v. Westinghouse *352 Elec. Corp., 55 N.J. 322, 330, 261 A.2d 657 (1970)). As such, the "judgment of the initial factfinder ... is entitled to very considerable respect." Id. at 597, 379 A.2d 225.
Here, plaintiff suffered extreme pain initially and then significant but less severe pain as treatment continued. It interfered with her sleep and daily activities. There was a concern that the tendons would desicate and rupture thereby causing permanent damage to her fingers. She currently still suffers from some level of pain and has limited use of two fingers. Pictures of the open wound, taken after each debridement procedure, were introduced into evidence without objection. They showed a large open wound on plaintiff's swollen hand. The pictures are very graphic and could even be described as dramatic. On the other side of the argument, plaintiff is retired and therefore suffered no loss of income. The injury occurred to her non-dominant hand and the recovery has been significant. Apparently, at this point the hand is cosmetically acceptable.
The trial judge was persuaded that the verdict was excessive and the problem was caused by the pictures introduced into evidence. On the motion for a new trial, he characterized the pictures as "inflammatory." We are satisfied the trial judge did not exceed the bounds of proper discretion in finding that the jury's award was manifestly excessive. The jury apparently focused on the wound at the two points in time depicted in the photographs and extrapolated that vision into the entire healing process.
We also believe that remittitur and not a new trial was the proper remedial mechanism. Remittitur is an accepted procedure to correct an excessive jury award without necessitating the expense and delay of a new trial. Taweel, supra, 58 N.J. at 231, 276 A.2d 861. As such, it is an integral and encouraged part of the trial process. Ibid. Its use is only appropriate, however, when there is no concern as to the propriety of the jury's decision concerning liability. Tronolone v. Palmer, 224 N.J.Super. 92, 98, 539 A.2d 1224 (App.Div.1988); Henker v. Preybylowski, 216 N.J.Super. 513, 517, 524 A.2d 455 (App.Div.1987). In certain instances an award may be so high "as to demonstrate prejudice, partiality or passion and thus to generate the feeling the entire verdict was tainted." Taweel, supra, 58 N.J. at 231, 276 A.2d 861. In such cases the use of remittitur is inappropriate. The test is whether, apart from the excessiveness of the award, there was "adequate support for the jury's finding on liability." Ibid.; Brown v. Kennedy Mem'l Hosp., 312 N.J.Super. 579, 593-594, 711 A.2d 1370 (App.Div.), certif. denied, 156 N.J. 426, 719 A.2d 1024, 1025 (1998).
In the present case we are satisfied remittitur was the proper remedy for the excessive verdict. The record is devoid of any indication of passion, prejudice or partiality. We agree with the evaluation of the trial judge that the excessiveness in all probability flowed from the dramatic nature of the photographs introduced into evidence. We cannot, however, find any basis in this record to conclude that those pictures somehow improperly influenced the determination on liability. Indeed, the negligence in this case was patent and the real issue was how to divide it between the two nurses. Unlike the circumstances in Fertile v. St. Michael's Med. Ctr., 334 N.J.Super. 43, 756 A.2d 1037 (App.Div. 2000), where we concluded that remittitur would not sufficiently correct an improper verdict, here liability was not a close question and there were no improper remarks on summation to compound the problem. Moreover, in Fertile we found that, as a matter of law, the evidence adduced on behalf of plaintiff Marlene Fertile was insufficient to support any award, much less the $3 million awarded by the jury or even the $250,000 granted on remittitur. Id. at 55, 756 A.2d 1037. The $15 million awarded to plaintiff Danialie Fertile was found to be so in excess of any reasonable jury award as to strongly suggest a tainted *353 verdict. Id. at 58, 756 A.2d 1037. In the present case the magnitude of the excessive verdict is not so great as to engender a concern over the liability determination.
Finally, in our view, the reduction to $500,000 was well-within the court's discretion. While arguments can be made that the remittitur should have been more or less, the determination of the trial judge did not constitute a miscarriage of justice.
The judgment in favor of plaintiff, as reduced by the trial court, is affirmed.