914 A.2d 838 (2006)
390 N.J. Super. 108
Dorothy CLARK, as Administratrix Ad Prosequendum and General Administratrix of the Estate of William M. Clark, Plaintiff-Respondent,
v.
UNIVERSITY HOSPITAL-UMDNJ; Raquel Forsythe, M.D., Thomas Chiodo, M.D., Defendants-Appellants, and
Kenneth G. Swan, M.D., Kelly McLear, R.N., Ron C. Bagley, R.N., Michelle Haynes Mintz, R.N., and Beatrice Addo, R.N., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 2006.
Decided November 15, 2006.
*840 Louis A. Ruprecht, Millburn, argued the cause for appellants (Ruprecht, Hart & Weeks, attorneys; Mr. Ruprecht, of counsel and on the brief).
David A. Mazie, argued the cause for respondent (Nagel, Rice & Mazie, attorneys; Mr. Mazie, of counsel and on the brief; Randee M. Matloff, Roseland, on the brief).
Before Judges LEFELT, PARRILLO and SAPP-PETERSON.
LEFELT, P.J.A.D.
Plaintiff decedent, William Clark, sustained serious injuries in an automobile accident and came under the care of defendants Dr. Raquel Forsythe and Dr. Thomas Chiodo, who were residents at defendant University HospitalUniversity of Medicine and Dentistry of New Jersey. According to plaintiff's expert, the doctors failed to properly drain the gastric contents from William Clark's stomach causing him to choke to death on his own vomit during a period of at least four minutes. Defendant doctors and the hospital appeal from an adverse jury verdict, which awarded plaintiff Dorothy Clark, William Clark's widow, $2 million for her husband's pain and suffering and $1 million for the wrongful death pecuniary losses she suffered.
Defendants advance the following arguments on their behalf: (1) the trial judge, Stephen Bernstein, erred when he instructed the jury that the conduct of defendant residents should be "judged against a standard applicable to general practitioners;" (2) the jury award for pain and suffering was "clearly excessive," the result of "passion and prejudice," and warrants a new trial; (3) the trial court "improperly charged the jury" regarding the effect of plaintiffs' settlement of the automobile accident; (4) the trial court erred by failing to provide a sufficient curative instruction when plaintiffs' counsel "improperly injected into the trial" an informed consent issue; (5) the trial court erred when it permitted plaintiffs' counsel to "improperly read, paraphrase[] and misstate[]" the deposition of the medical examiner; and (6) plaintiffs' counsel "improperly added a new theory of liability and causation" during summation.
We reject defendants' arguments (4)-(6) and find them to be without sufficient merit to warrant any discussion in a written decision. R. 2:11-3(e)(1)(E). Although we also reject defendants' arguments (1)-(3), these arguments have sufficient merit to warrant further discussion. Consequently, though we affirm the jury verdict and judgment, we discuss defendants' arguments (1)-(3) in turn. Because of the nature of the arguments advanced by defendants, we discuss the pertinent facts in conjunction with our analysis of each argument.

*841 I.

The Standard of Care
As a result of the automobile accident, William Clark suffered serious injuries that brought him to defendant hospital for medical care and treatment. As one consequence of these injuries, Mr. Clark's intestines failed to empty their contents and his stomach had to be decompressed and drained. To accomplish this result, a nasogastric tube had to be inserted through his nostril into his esophagus and down into the stomach.
Plaintiffs tried the case on the theory that two residents were negligent and caused William Clark's death. Plaintiffs claimed Dr. Chiodo, an oral and maxillofacial surgical resident, deviated from the applicable standard of care by not replacing the tube in proper position after Mr. Clark had pulled out a previously properly placed tube. Plaintiffs also claimed Dr. Forsythe, a surgical resident, deviated from the standard of care by failing to examine Mr. Clark and by failing to direct Dr. Chiodo to replace the tube after the patient had pulled the tube out once again. Both doctors in consultation decided that the tube would not be inserted a third time. According to plaintiffs' primary theory, William Clark died when he aspirated, which is the migration of stomach contents into the lungs, and then went into cardiac arrest.
Defendants disagreed with plaintiffs' malpractice claim and theory of death. They essentially asserted that William Clark had the right to refuse treatment and, therefore, there could be no deviation from the pertinent standard of care for the failure to intubate him for the third time after two self-extubations. According to defendants, Mr. Clark died of cardiac arrest and not aspiration.
Defendants assert on appeal that "a resident who is still in training, who must practice under the supervision of an attending physician and who may not even be licensed to practice medicine must be judged by the standard particular to that resident at that particular point in his or her training." The trial court rejected a charge that would have limited the care expected of defendants to residents in the defendants' respective specialties. Instead, without objection by defendants' counsel, the judge instructed the jury that "the defendants were both residents training for their medical specialties, but for purposes of this case are considered to be general practitioners in medicine." The judge went on to require defendants to "employ [the] knowledge and skill normally possessed by the average physician practicing his or her profession as a general practitioner."
In this State, N.J.S.A. 45:9-1 to 9-58 and N.J.A.C. 13:35-1 to -2.13 (physicians) and 13:35-4.1 to -4A.18 (surgeons) regulate the licensure of physicians and surgeons. In order to practice medicine or surgery in New Jersey, applicants must successfully complete a four-year medical school program and a one-year internship[1] or complete one year of approved postgraduate work and pass an exam administered by the State Board of Medical Examiners. N.J.S.A. 45:9-6, N.J.S.A. 45:9-8.
Furthermore, under our laws a "person shall be regarded as practicing *842 medicine and surgery" who identifies himself/herself as "Dr.", "doctor", or "M.D.",
and who, in connection with such title or titles, or without the use of such titles, or any of them, holds himself out as being able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition, or who shall either offer or undertake by any means or methods to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition.
[N.J.S.A. 45:9-18.]
In this case, Dr. Forsythe was in her fourth year as a resident, and had also completed an additional year of research after her successful completion of medical school. Acting as the chief resident, she referred to herself as a "doctor" and held herself out as "able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition," N.J.S.A. 45:9-18.
In November 2001, Dr. Chiodo had graduated from dental school, completed a one-year general medical practice residency, completed a one-year surgical internship and was in his second year of his four-year surgical residency.[2] He had also completed five months of general anesthesia training before he treated Mr. Clark, where he "essentially . . . function[ed] as [an] anesthesiologist," at the hospital, where he administered drugs to put patients to sleep and inserted breathing tubes.
Accordingly, the out-of-state cases upon which defendants rely for a lesser standard of care are distinguishable from the facts in this appeal. The defendant residents in this case were unlike the first-year unlicensed resident with limited authority discussed in Phelps v. Physicians Ins. Co. of Wis., Inc., 282 Wis.2d 69, 698 N.W.2d 643, 655 (2005), and the intern unlicensed to practice medicine in Ohio addressed in Rush v. Akron Gen. Hosp., 171 N.E.2d 378, (Ohio Ct.App.1957).[3] Also, Bahr v. Harper-Grace Hosps., 198 Mich.App. 31, 497 N.W.2d 526, 528 (1993), rev'd in part on other grounds, 448 Mich. 135, 528 N.W.2d 170, 171 (1995), explained that "although the applicable standard of care for general practitioners is that of the local community or similar communities, the standard of care for a specialist is nationwide." Because "interns and residents are not `specialists,' . . . therefore, . . . the applicable standard of care for such persons is that of the local community or similar communities." Ibid. Thus, Bahr actually supports the trial court's finding that defendants, who were not yet specialists, *843 should be treated similarly to general practitioners. Bahr did not find that residents should be held to a lower standard than general practitioners.
There are also several federal court decisions where, without discussion, the courts held residents, or other medical-care-givers with even less training, to the same standard as physicians. E.g., Powers v. United States, 589 F.Supp. 1084, 1091, 1099 (D.Conn.1984) (first-year resident held to same standard as doctor); Steeves v. United States, 294 F.Supp. 446, 453, 454-55 (D.S.C.1968) (one-month intern held to same standard as doctor). At least one state court opinion similarly held residents to the same standard. Green v. State of Louisiana, 309 So.2d 706, 708, 712 (La.Ct.App.1975) (unlicensed foreign doctor employed under temporary permit held to same standard as doctor), cert. denied, 313 So.2d 601 (La.1975); Lindsey v. Michigan Mut. Liab. Co., 156 So.2d 313, 315, 316 (La.Ct.App.1963) (intern held to same standard as doctor).
There is no support in New Jersey for defendants' argument. Indeed, reducing the standard of care for licensed doctors in their residencies because of the limited nature of their training would set a problematic precedent. For example, should we reduce the standard for doctors who are inexperienced in a particular procedure that they negligently performed? Or should we also reduce the standard of care for doctors who graduated in the lower third of their medical school? Defendants held themselves out as doctors and should be held to the standard of care they claimed to profess. Anything less would not comport with the care William Clark expected and was entitled to receive.

II.

The Pain and Suffering Verdict
After the jury verdict, defendants moved for a new trial, based on several grounds, including the excessiveness of the jury award. Defendants argued that the $2 million award for the four minutes of conscious pain and suffering was a "staggering number" and "the number alone taints the entire verdict, in terms of damages, and warrants a new trial." Judge Bernstein rejected the new trial motion and explained that "the amount awarded by the jury fails to shock the conscience of the Court, which is the standard that must be utilized." See Caldwell v. Haynes, 136 N.J. 422, 432, 643 A.2d 564 (1994).
Defendants argue that the Legislature amended the standard of review in medical malpractice cases when it promulgated the New Jersey Medical Care Access and Responsibility and Patients First Act (Act), N.J.S.A. 2A:53A-37 to -42. Specifically, defendants assert that N.J.S.A. 2A:53A-42 sets forth a new, less deferential standard, and therefore the trial court erred by applying the former "shocks the conscience" standard.
The Act provides, in pertinent part, that "upon a motion by any party for additur or remittitur, [the judge shall] determine whether the award is clearly inadequate or excessive in view of the nature of the medical condition or injury that is the cause of the action or because of passion or prejudice by the jury." Ibid.
For purposes of this decision, we assume that the Act is not limited to situations where a party has moved for additur or remittitur, but to any excessive award claim in a malpractice case. The Legislature has not explicitly stated whether it intended to create a new standard of review, or merely codify the common-law. See L. 2004, c. 17.
The Legislature identified its purpose in promulgating the Act as a response to the "dramatic escalation in medical malpractice *844 liability insurance premiums" that had caused doctors to discontinue practice in New Jersey, to drop high risk patients, and had caused an increase in the cost of medical care. N.J.S.A. 2A:53A-38 (a)-(c). Therefore, to control the cost of medical malpractice liability insurance and to maintain access to the state's health-care system, the Legislature drafted "a comprehensive set of reforms affecting [among other areas,] the State's tort liability system." N.J.S.A. 2A:53A-38(d)-(f).
Although the Legislature did not import the phrase: "shocks the conscience," the language of the statute largely mirrors the standard that has traditionally been applied under the common law. Under the common law, "`[t]he object [of the court's review of an award] is to correct clear error or mistake by the jury.'" Baxter v. Fairmont Food Co., 74 N.J. 588, 598, 379 A.2d 225 (1977) (quoting Dolson v. Anastasia, 55 N.J. 2, 6, 258 A.2d 706 (1969)). The test requires the court to determine if an award is "so disproportionate to the injuries and resulting disabilities shown as to shock [the court's] conscience." Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 236, 276 A.2d 861 (1971).
We discern no difference between the common law standard and the statutory language of the Act. Indeed, as Justice Long explained, "there is simply no principled distinction between [excessive damages that shock the judicial conscience] and grossly excessive ones." Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 498, 779 A.2d 1078 (2001). Similarly, there is no distinction between "clearly excessive" damages and those that are "so disproportionate as to shock the judicial conscience."
Defendants nevertheless argue that the pain and suffering award was excessive and the product of passion or prejudice because "the only pain and suffering that could be attributed to the defendants was for that [brief] period when William Clark aspirated to the moment he became unconscious." In support of this position, defendants cite several out-of-state death-by-drowning cases that have found pain and suffering awards excessive. However, "`[n]o case of personal injuries is ever an exact and binding precedent for another upon the question of excessiveness of a verdict even where there is a close parallelism of facts and circumstances.'" Thalman v. Owens-Corning Fiberglas Corp., 290 N.J.Super. 676, 682-83, 676 A.2d 611 (App.Div.1996) (quoting Moore v. Public Service Coordinated Transp., 15 N.J.Super. 499, 512, 83 A.2d 725 (App.Div. 1951)).
In this case, Judge Bernstein understood that the jury must have rejected defendants' claim that Mr. Clark died of a heart attack. Instead, the jury accepted plaintiff's expert's testimony describing the manner in which William Clark died.
Earlier, everyone anticipated that Mr. Clark would recover from the injuries he suffered in the car accident and be discharged from the hospital in about five days. Instead, he choked to death on his own vomit unable to breathe or move or call for help while lying in the hospital. This death was described as "horrible," as if he were "drowning" in his own secretions.
Under these circumstances, the trial judge did not find the pain and suffering award excessive, and neither do we. Obviously, we also do not believe that the verdict caused a clear injustice warranting a new trial. See R. 4:49-1(a); Boryszewski v. Burke, 380 N.J.Super. 361, 391, 882 A.2d 410 (App.Div.2005), certif. denied, 186 N.J. 242, 892 A.2d 1288 (2006).

*845 III.

The Jury Charge on the Settlement
In this case, the other automobile driver settled with plaintiffs for $702,898.79 before any suit was filed. This settlement was less than the $1.5 million value the jury placed on Mr. Clark's injuries that were caused solely by the automobile accident.
Defendants, in the malpractice action, never filed any third-party claim against the other driver, and plaintiffs, of course, had no need to add the other driver as a defendant in the malpractice litigation.
Defendants argue that the trial court failed to charge the jury in conformance with Ciluffo v. Middlesex Gen. Hosp., 146 N.J.Super. 476, 370 A.2d 57 (App.Div. 1977). Ciluffo can be applied in situations, like the instant matter, where plaintiff is first subjected to a tort that brings him to a hospital where medical care providers then subject plaintiff to a second, independent tort. When the first tortfeasor settles with plaintiff, the health care provider "may receive credit for part of the payment made earlier by the other tortfeasor `to avoid duplicating compensation to the plaintiff.'" Id. at 483, 370 A.2d 57 (quoting Daily v. Somberg, 28 N.J. 372, 386, 146 A.2d 676 (1958)).
To apportion the damages, the jury is usually asked to determine the total damages suffered by plaintiff and then the damages solely caused by the health care provider. Id. at 482, 370 A.2d 57. By subtracting the health care provider's damages from the total damages, those attributable to the first tortfeasor can be derived. If the settlement exceeds the damages attributable to the original tortfeasor, the health care provider is entitled to a credit of that amount against the verdict assessed to the health care provider. When the settlement is less than the damages attributable to the first tortfeasor, the health care provider receives no credit.
In this case, instead of asking the jury to determine total damages and the malpractice damages, the judge instructed the jury to determine what damages flowed from the malpractice and what damages were caused by the initial accident. Therefore, the two damage amounts together would constitute "total damages."
In his instructions, the judge told the jury about the settlement and that the law requires that there not be a "double recovery or a windfall." The judge explained that therefore, the jury is "asked to determine the amount of damages that would compensate the plaintiff William Clark for the injuries that William Clark sustained solely from the automobile accident prior to his death." The judge further explained that defendants "will receive a credit for any amount paid by the other driver in the settlement in excess of the amount you determine to be the damage sustained solely from the automobile accident." In addition, the judge stated that the jury "need not concern yourself nor will we know the amount of the settlement, as the Court will mold or calculate the final verdict using the damages based on the numbers that you determine in the verdict sheet."
Thus, the jury was asked in the verdict sheet to "set forth the sum of money that will fairly and reasonably compensate the estate of William Clark for the losses sustained for the pain and suffering of William Clark due to the defendants' negligence." By unanimous vote the jury answered $2 million. The verdict sheet also asked the jury "what amount of money would fairly and reasonably compensate the plaintiff for pain, suffering, disability, impairment and loss of enjoyment *846 of life solely caused by the automobile accident." The jury responded, also unanimously, $1.5 million.
We disagree with defendants that this manner of proceeding was incorrect or misleading. We discern no essential difference between the process contemplated by Ciluffo and the process utilized here.
In reviewing the charge as a whole, as is necessary, Vallejo by Morales v. Rahway Police Dep't, 292 N.J.Super. 333, 342, 678 A.2d 1135 (App.Div.), certif. denied, 147 N.J. 262, 686 A.2d 763 (1996), we do not find the instruction improper. We do not agree that the jury could have thought that in molding the verdict, the court intended to subtract the auto accident damages from the health care providers' damages, resulting in a total pain and suffering award for defendants' malpractice of $500,000.
Furthermore, because the amount of damages assigned by the jury for the accident far exceeded the settlement amount, there was no credit due defendants from the settlement. Therefore, the additional arguments, regarding (1) the judge's bifurcation of the allocation of responsibility between William Clark and the other automobile driver and (2) whether Ciluffo applies at all to this case where the other driver was never sued, are moot.

IV.

Defendants' remaining contentions
We have concluded that all of defendants' remaining contentions are without merit. R. 2:11-3(e)(1)(E). We add only the following regarding defendants' argument that plaintiffs' counsel improperly added a new theory of liability and causation in summation.
While plaintiffs' primary theory was that William Clark aspirated before the heart attack, counsel explained that its secondary theory was that "even if [defendants] are correct that [Mr. Clark] had a cardiac arrest, which I don't believe to be the case, the aspiration affected his ability to survive."
Defendants erroneously argue that there was insufficient evidence supporting plaintiffs' secondary theory and that because counsel raised the argument in summation they were surprised and unfairly precluded from responding. In fact, however, the argument was based on a concession during testimony by one of defendants' experts and had been advanced by plaintiff as a basis for directed verdict and during the charge conference.
Defendants also argue that the judge improperly instructed the jury about the law that applies to such a theory. Although Judge Bernstein acknowledged that Scafidi v. Seiler, 119 N.J. 93, 574 A.2d 398 (1990) applied to the theory, defendants vigorously opposed such an instruction. Defendants rejected the charge because they did not want the jury to consider the possibility that William Clark's heart failure combined with any malpractice to result in death. After summation, defendants simply asked that the jury be instructed not to consider plaintiffs' "second theory" of liability. They cannot now claim the failure to provide a Scafidi charge was error. See Brett v. Great Am. Recreation, Inc., 144 N.J. 479, 503, 677 A.2d 705 (1996).
In conclusion, defendants have advanced no argument sufficient to overturn the jury's verdict. Accordingly, we affirm the verdict and judgment in favor of plaintiff and against defendants.
Affirmed.
NOTES
[1] In 2001, the legislature amended this statute to require those applicants who graduated from a medical school after July 1, 2003, "[to] further prove to the board that, after receiving his diploma, he has completed and received academic credit for at least two years of post-graduate training in an accredited program and has signed a contract for a third year of post-graduate training in an accredited program." N.J.S.A. 45:9-8(b)(2); L. 2001, c. 307 § 6. However, this provision does not apply to defendants in this case.
[2] N.J.S.A. 45:6-19.5 provides that dentists who "have been approved and [have] been granted privileges by the medical staff of a public or private licensed hospital" may:

a. Diagnose and treat patients admitted for acute or chronic illness, injury or deformity within the province of the human jaw and associated structures and complete and authenticate medical records of patients admitted or treated for dental or oral and maxillofacial surgical problems; and
b. Prescribe medication and treatment for patients admitted for dental or oral and maxillofacial surgical problems.
A dentist, other than a qualified oral and maxillofacial surgeon, who performs one or more of the procedures set forth in this section shall arrange for appropriate medical consultation to be provided by a qualified physician member of the medical staff of the hospital or institution for a patient of a dentist.
[3] After Rush, an intermediate court in a different district of Ohio held that there is no separate standard for interns or residents. Jenkins v. Clark, 7 Ohio App.3d 93, 454 N.E.2d 541, 551 (1982) (Court found that the standard instruction was correct as it "clearly informed the jury that the medical care required is that of reasonably careful physicians or hospital emergency room operators, not that of interns or residents.").