983 A.2d 1164 (2009)
411 N.J. Super. 15
MING YU HE and Jinfang He, Plaintiffs-Appellants,
v.
Enilma MILLER, Defendant-Respondent, and
Randy Miller, Defendant.
DOCKET NO. A-5685-07T3.
Superior Court of New Jersey, Appellate Division.
Argued December 1, 2008.
Decided March 27, 2009.
Remanded by Supreme Court June 5, 2009.
Re-argued November 12, 2009.
Decided December 15, 2009.
*1166 August R. Soltis, argued the cause for appellant.
Michael J. Marotte, Morristown, argued the cause for respondent (Schenck, Price, Smith & King, attorneys; Mr. Marotte, of counsel; Sandra Calvert Nathans, on the brief).
Before Judges FISHER, SAPP-PETERSON and ESPINOSA.
The opinion of the court was delivered by
FISHER, J.A.D.
We again review an order granting remittitur or, upon its rejection, a new trial on damages. We previously reversed, but the Supreme Court summarily reversed in part and remanded for the trial judge's complete and searching analysis, including an assessment of comparable jury verdicts, to be followed by our reconsideration. Having reexamined the matter, we again reverse and reinstate the jury's verdict.

I
The complaint filed by plaintiff Ming Yu He, and her husband, Jinfang He, against defendant Enilma Miller,[1] was tried to a jury over four days in February 2008. The jury found defendant to have been negligent and awarded plaintiff $1,000,000 for pain and suffering, $110,000 for past lost wages, and $500,000 for future lost wages; the jury also awarded plaintiff's husband $100,000 on his loss of consortium claim.
Defendant filed a post-verdict motion seeking a new trial or, in the alternative, a remittitur. The trial judge granted the motion in part. He found the pain and suffering award, as well as the per quod award, to be excessive and shocking to the conscience. He granted a remittitur of the pain and suffering award to $200,000 and the per quod claim to $10,000. The judge also ordered a new trial on damages if plaintiffs rejected the remittitur. Plaintiffs rejected the remittitur and moved for leave to appeal.
We granted leave to appeal and subsequently reversed by way of an unpublished opinion. He v. Miller, No. A-5685-07T3, 2009 WL 790940 at *8 (App.Div. March 27, 2009).
The Supreme Court granted defendant's petition for certification, summarily reversed our judgment in part and remanded the matter to the trial judge "for a complete and searching analysis under [Johnson v. Scaccetti, 192 N.J. 256, 927 A.2d 1269 (2007)], including a `factual analysis of how the award is different or similar to others to which it is compared,' id. at 281, 927 A.2d 1269." He v. Miller, 199 N.J. 538, 539, 973 A.2d 943 (2009). The Court also directed that we reconsider our judgment "in light of the findings developed on remand." Ibid.
On August 12, 2009, the trial judge rendered a decision further explaining and adhering to his finding of excessiveness. The parties have since filed briefs relating to the trial judge's most recent decision, *1167 and we have again heard the oral argument of counsel.

II
In our earlier unpublished opinion, we canvassed the evidence adduced at trial. To summarize, plaintiff Ming Yu He was injured when, on October 28, 2003, her motor vehicle was struck head-on by defendant's vehicle. Plaintiff was rendered unconscious by the impact and transported by ambulance to a nearby hospital. X-rays revealed no fractures and she was discharged. However, due to continuing pain, she visited a chiropractor on three occasions, but received no relief.
On November 6, 2003, plaintiff was examined by Dr. Robert Kramberg, who found a limited range of motion in plaintiff's cervical spine and lower back, back spasms, bruising and abnormal nerve sensation. Dr. Kramberg prescribed various medications, including painkillers. He also started a program of physical therapy.
A few weeks later, in light of plaintiff's continued complaints of pain in her neck, lower back and left knee, Dr. Kramberg ordered magnetic resonance imaging (MRI) of plaintiff's cervical and lumbar spine. The MRI revealed that plaintiff had four herniated or ruptured discs, located at C4-C5, C5-C6, L4-L5 and L5-S1. An electromyography determined that the herniated discs were causing compression of the nerves, which affected plaintiff's arms, legs and back. Dr. Kramberg concluded that plaintiff was suffering from radiculitis or radiculopathy from the herniated discs in both the cervical and lumbosacral spine.
The physical therapy program failed to produce satisfactory results. As a result, Dr. Kramberg referred plaintiff to Dr. Jay Lee, who performed over thirty acupuncture treatments on plaintiff's hands, neck, waist and back. These treatments only provided temporary relief.
Epidural injections of cortisone brought about no significant improvement. Indeed, plaintiff experienced a bad reaction from the cervical epidurals, and the lumbar epidural injections caused plaintiff's leg to become swollen. Consequently, plaintiff received no further injections.
Dr. Kramberg referred plaintiff to a neurosurgeon. MRIs taken at that time were consistent with the earlier findings. The neurosurgeon did not recommend surgery, explaining that "whether or not a spinal patient is referred to surgery depends on the particular patient and particular injury." Dr. Kramberg also observed that
not all patients do well with surgery. And once you have a failed surgery, there's nothing else you can do for the patient. They wind up on lifetime narcotic pain medication.
Dr. Kramberg testified at trial that after five years of unavailing treatment, plaintiff's pain was "chronic [and] permanent." As we explained in our earlier opinion, Dr. Kramberg opined that plaintiff
continued to have limited range of motion, and he believed she was medically incapable of performing her job as a housekeeper at a hotel. He continued to prescribe pain medication (Vicodin) to plaintiff and she last saw him in January 2008. In Dr. Kramberg's opinion, based upon the MRI and EMG results, the physical examination, plaintiff's complaints, and the fact that plaintiff had been completely asymptomatic prior to the accident, her injuries were causally related to the October 28, 2003 accident.
[2009 WL 790940 at *2.]
Dr. Kramberg also acknowledged that testing revealed plaintiff had "a little bit of arthritic degeneration on the vertebrae," *1168 which he determined was part of the "normal aging process" and "pretty much consistent with her age, being in her [forties]." Defendant's expert, an orthopedic surgeon, opined that "there's a good suspicion that a lot" of the MRI and EMG findings "are degenerative and preexisting," but acknowledged "there's really no way of ascertaining, based on these films, whether or not the disc herniations are a result of the degenerative changes or not."
Plaintiff, her husband and their daughter also testified about the injury and its sequelae, which we summarized in our earlier opinion in the following way:
Plaintiff testified as to how the accident and her resulting injuries impacted upon her activities of daily living. She indicated that she experienced neck and back pain "on a daily basis[,]" which often spread and caused headaches and pain in the legs and hands, and sometimes caused her to lose her grip and drop things. She was no longer able to work at the job she held for thirteen years and could not perform most normal household duties such as grocery shopping, cooking a full meal, gardening, vacuuming, cleaning, or participating in activities with her children. She also testified she was no longer able to swim or ride a bicycle.
Plaintiff's husband and daughter provided similar testimony as to plaintiff's home life. Both plaintiff and her husband testified that they brought their parents to the United States from China so that they would not have to work in their old age and their daughter could take care of them, in accordance with the Chinese custom of filial piety. Now, according to plaintiffs, the situation had been reversed, with the grandparents taking care of plaintiff by helping out with the chores she could no longer perform. They both also testified that they have been completely unable to have sexual relations since the accident because their attempts to do so were continually foiled by the onset of back and neck pain for plaintiff. Plaintiff told the jury that since the accident, she felt "useless."
[2009 WL 790940 at *3.]

III
Defendant moved for a new trial or, in the alternative, for a remittitur. Among other things, defendant argued that the $1,000,000 pain and suffering award was shockingly high because of verdicts rendered in other purportedly similar cases. Based on references in defendant's moving papers to the verdicts in thirteen other cases, defendant contended that a proper award should have fallen within a range between $50,000 and $100,000.
The judge denied the motion insofar as it related to liability, the past lost wage award of $110,000, and the future lost wage award of $500,000. He did, however, conclude that the pain and suffering award of $1,000,000 and the per quod award of $100,000 were shocking to the conscience and warranted relief, explaining:
Based upon the fact that surgery was never recommended for [plaintiff], that she has degenerative dis[c] disease, that she is able to care for herself, drive a motor vehicle and perform light housekeeping, as well as the fact that she did not appear to be experiencing pain and suffering during the course of the trial and was able to sit for long periods of time during the trial, I find that the jury award of $1M to [plaintiff] for her injuries constitutes a manifest injustice that shocks the judicial conscience.
In so ruling, the judge made no mention of verdicts in other cases of a similar nature.
*1169 Plaintiff rejected the remittitur and moved for leave to appeal. At the same time, the judge issued a written amplification of his oral decision, pursuant to Rule 2:5-1(b), which mainly explained why, if remittitur was rejected, a new trial on all elements of damages, and not just the remitted components, was required. The judge found that "in the case at bar, there is an interrelationship" between the awards he found excessive and those he found were not excessive.
As noted earlier, we granted leave to appeal. Following the perfection of the appeal, we reversed by way of an unpublished opinion. The Supreme Court granted certification, reversed in part and remanded to the trial court "for a complete and searching analysis under Johnson, supra, including `a factual analysis of how the award is different or similar to others to which it is compared.'" 199 N.J. at 539, 973 A.2d 943 (quoting Johnson, supra, 192 N.J. at 281, 927 A.2d 1269).
Although the trial judge's initial decision and subsequent amplification made no reference to comparable jury verdicts in finding parts of this verdict to be shockingly high, following the Supreme Court's mandate the judge rendered a written decision in which he identified certain verdicts he thought were relevant.
Specifically, the judge referred to two cases over which he presided. The first, Morales v. Keith, was an action brought by a thirty-four-year old male plaintiff who, as a result of an auto accident, was diagnosed with one herniated disc and one disc bulge. The plaintiff in Morales was also diagnosed with bilateral carpal tunnel syndrome, which required surgery. The jury awarded $2500, which was increased by stipulation of the parties to nearly $50,000.
The second, Ziza v. Romanelli, was an action commenced by a fifty-five-year old female plaintiff who suffered a hairline fracture of an ankle, and torn ligaments, as a result of a fall-down accident. A disputed issue at trial related to plaintiff's claim of reflex sympathetic dystrophy (RSD); she was treated for the alleged RSD through surgical implantation of a spinal cord stimulator. According to the trial judge,
despite some degree of relief from the stimulator, plaintiff still experienced pain. In addition, the facts revealed that plaintiff's lifestyle and her relationship with her husband were affected by the injuries. Further, plaintiff was unable to continue working in the family bakery business where she had worked for many years.
The jury awarded the plaintiff in Ziza $200,000; her husband received $25,000.
The trial judge summed up the significance of these verdicts in the following way:
Although the injuries sustained in the above-noted cases were not identical to those sustained by [p]laintiff in this case, the cases provided a basis for comparison to the matter involved herein, as they involved spinal and/or other serious injuries which had a significant impact on the lives of the plaintiffs. The [c]ourt found it particularly noteworthy that even in a case which required the permanent implantation of a spinal stimulator and ligament reconstruction surgery, the jury award did not exceed $200,000.00.
Not only, as the judge recognized, were the injuries sustained in these two cases different from those sustained by plaintiff here, but the cases involved persons of different ages who led different lives.
The judge went on to mention verdicts in other cases, but only briefly. His commentary concerning those verdicts consists only of the following:

*1170 In addition to the cases over which the [c]ourt presided [i.e., Morales and Ziza], the [c]ourt reviewed and took into account cases cited by [d]efendant in support of the motion for remittitur in order to establish a frame of reference by which to evaluate the jury's award. It should be noted that the [p]laintiff did not cite any contrary cases. The [c]ourt specifically notes the following cases cited by [d]efendant: Astarita v. Tilcon Industries; Regan v. Eddy; Shamosh v. Hall; Fernandez v. Carvalho; Hossain v. Reid; and Boghdady v. Antala. As in this matter, both the Astarita and Regan cases were venued in Morris County. In Astarita, plaintiff was injured when he was struck by a motor vehicle in a parking lot. Plaintiff was diagnosed with disc herniations at L3-L4 and L4-L5 and underwent a laminotomy, a surgical procedure in which a portion of his vertebral lamina was removed. The jury returned a verdict in favor of plaintiff for $200,000.00. In Regan, plaintiff's vehicle was struck head-on by defendant's vehicle. Plaintiff was diagnosed with disc herniations at C5-C6 and C6-C7 and received conservative treatment. The jury awarded plaintiff $150,000.00.
Cases venued in other counties also revealed substantially lower verdicts than the one rendered in this case. In Shamosh, plaintiff was diagnosed with disc herniations at L4-L5 and L5-S1 and lumbar radiculopathy following an accident. Plaintiff subsequently underwent decompression surgery. The jury rendered an award of $50,000.00. In Fernandez, following an accident, plaintiff was diagnosed with multiple herniations at C4-C5, C5-C6, and L5-S1, as well as a central disc protrusion at L4-L5. In that matter, the jury awarded plaintiff $100,000.00. Similarly, in Hossain, following a motor vehicle accident, plaintiff sustained a disc herniation at L4-L5 with radiculopathy. Plaintiff's treatment included, as in this matter, five epidural injections. Further, plaintiff was unable to work for an extended time period and ultimately gave up his job as a taxi driver. The jury awarded plaintiff $50,000.00. In Boghdady, as in the instant case, plaintiff was diagnosed with multiple disc herniations, specifically herniations at C3-C4, C4-C5, and C6-C7, as well as a disc bulge at C5-C6. Plaintiff underwent orthopedic treatment which included epidural injections. The jury awarded plaintiff $40,000.00.
In taking into account the above-cited cases, it should be noted that the [c]ourt was only provided with limited factual details. However, the [c]ourt regards the cases cited by [d]efendant as a valid basis for comparison in light of Dr. Kramberg's findings that [p]laintiff's injuries and complaints were "pretty much a textbook case." Further, although not identical, the cited cases contain similarities to the instant case. Specifically, in each case plaintiff suffered spinal injuries following an accident. In addition, the course of treatment which the plaintiffs underwent, to varying degrees, is akin to that which [p]laintiff received in this matter. The cases establish a spectrum of jury awards which range between $40,000.00 and $200,000.00. Notably, even in those cases where major invasive surgery was indicated and/or performed, the jury award did not exceed $200,000.00. In making its comparative analysis, the [c]ourt could not help but recognize the great disparity between the award in this matter and those rendered in the cited cases where the plaintiffs sustained similarly serious injuries and, in several cases, required surgery.
[Docket numbers of cited cases deleted.]
*1171 Lastly, the judge referred to the twenty-two years he practiced law in Morris County, during which he concentrated "largely on plaintiffs' personal injury matters venued in Morris County." The judge explained that in his law practice he
worked on a myriad of matters involving spinal injuries which had a serious impact on the client's lifestyle. In addition, the [c]ourt was aware of countless other arbitration awards and jury verdicts involving injuries similar to those sustained by [p]laintiff. Despite the [c]ourt's experience and in light of [p]laintiff's injuries in this matter, the [c]ourt could not recall an award which was equal to the amount of the jury award in this case.
[Footnote deleted.] Based on this information and his own "feel of the case," the judge again concluded that the pain and suffering and per quod awards were excessive.

IV
The Supreme Court's mandate in this case requires that we reconsider our earlier decision "in light of the findings developed on remand." 199 N.J. at 539, 973 A.2d 943. Having carefully examined the trial judge's remand decision, we find no cause to alter our earlier judgment. In reaching that conclusion, we consider (a) the applicable principles for determining the excessiveness of a damages award, (b) the judge's examination of what he found were other comparable verdicts, and (c) the judge's description of the relevant facts and his "feel of the case."

A
A trial court's role in assessing a verdict is to ensure that damages awarded "encompass no more than the amount that will make the plaintiff whole, that is, the actual loss." Caldwell v. Haynes, 136 N.J. 422, 433, 643 A.2d 564 (1994). "Although `[t]he judicial role in reviewing jury verdicts... is essential to a rational system of justice,' the authority to set aside damages awards on grounds of excessiveness is `limited,'" Jastram v. Kruse, 197 N.J. 216, 228, 962 A.2d 503 (2008) (quoting Carey v. Lovett, 132 N.J. 44, 66, 622 A.2d 1279 (1993)), and should only occur "in clear cases," Fritsche v. Westinghouse Elec. Corp., 55 N.J. 322, 330, 261 A.2d 657 (1970).
To put these principles in perspective, we must recognize that juries are routinely instructed that to reach a reasonable measure of damages "[t]he law does not provide you with any table, schedule or formula by which a person's pain and suffering[,] disability, loss of enjoyment of life may be measured in terms of money." Johnson, supra, 192 N.J. at 280, 927 A.2d 1269. Jurors are told that the proper measure of damages is "left to [their] sound discretion," based on their common experiences regarding "the nature of pain and suffering, disability, impairment and loss of enjoyment of life" and the "function of money," and that
[t]he task of equating the two so as to arrive at a fair and reasonable award of damages requires a high order of human judgment. For this reason, the law can provide no better yardstick for your guidance than your own impartial judgment and experience.
[Ibid. (quoting Model Jury Charge (Civil), 6.11F, "DamagesPersonal Injuries: Disability, Impairment, Loss of Enjoyment of Life, Pain and Suffering" (1996)).]
As a result, following its recognition of the broad discretion that is "uniquely reposed in the jury's good judgment," our Supreme Court has directed that "to justify judicial interference [t]he verdict must be wide of *1172 the mark and pervaded by a sense of wrongness." Jastram, supra, 197 N.J. at 229, 962 A.2d 503 (quoting Johnson, supra, 192 N.J. at 281, 927 A.2d 1269).
In assessing excessiveness, the Supreme Court has determined that the trial judge's review "must be grounded substantially in the `totality of the evidence' in the record." Jastram, supra, 197 N.J. at 229, 962 A.2d 503 (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 598, 379 A.2d 225 (1977)). That evidence must be "viewed in a light most favorable to the plaintiff." Ibid. See also Johnson, supra, 192 N.J. at 281, 927 A.2d 1269; Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 236, 276 A.2d 861 (1971), overruled on other grounds, Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 779 A.2d 1078 (2001). This evaluation must encompass
the nature and extent of the injury, the medical treatment that the plaintiff underwent and may be required to undergo in the future, the impact of the injury on the plaintiff's life from the date of injury through the date of trial, and the projected impact of the injury on the plaintiff in the future.
[Jastram, supra, 197 N.J. at 229, 962 A.2d 503.]
The Supreme Court has also held that the trial judge "may look beyond the record to judicial `experience with other injury verdicts.'" Ibid. (quoting Fertile, supra, 169 N.J. at 501, 779 A.2d 1078). The Court cautioned, however, that if a judge goes outside the record to consider other verdicts, "it must give a factual analysis of how the award is different or similar to others to which it is compared." Id. at 229-30, 962 A.2d 503 (quoting Johnson, supra, 192 N.J. at 281, 927 A.2d 1269). Ultimately, a verdict "should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice." Baxter, supra, 74 N.J. at 597-98, 379 A.2d 225. As a result, even if "generous," a jury verdict having "reasonable support in the record" must "be regarded as final." Jastram, supra, 197 N.J. at 230, 962 A.2d 503 (quoting Taweel, supra, 58 N.J. at 236, 276 A.2d 861).
The appellate standard of review employs the same principles utilized in the trial court with the exception that the appellate court must afford "due deference" to the trial judge's "feel of the case" with regard "to the assessment of intangibles, such as witness credibility." Jastram, supra, 197 N.J. at 230, 962 A.2d 503. See also Feldman v. Lederle Labs., 97 N.J. 429, 463, 479 A.2d 374 (1984).

B
As we have observed, the Supreme Court mandated our reconsideration following the trial judge's further examination "including `a factual analysis of how the award is different or similar to others to which it is compared.'" 199 N.J. at 539, 973 A.2d 943 (quoting Johnson, supra, 192 N.J. at 281, 927 A.2d 1269). We, thus, turn to the judge's discussion of comparable verdicts in his remand decision.[2]
As recounted earlier, the judge relied on the verdicts in two cases over which he presided. These comparables possess little similarity to the case at hand. In the first, Morales v. Keith, plaintiff suffered a disc herniation, as well as a disc bulge, but it was the carpal tunnel syndrome that required surgery. Even at that, the jury *1173 only awarded $2500, whichfrom the information provided in the judge's opinionmight be more likely to suggest the verdict was shockingly low, as revealed by the parties' stipulation that increased the award to nearly $50,000. The second, Ziza v. Romanelli, involved a plaintiff who sustained a hairline ankle fracture and torn ligaments; it also included a dispute between the parties regarding a diagnosis of RSD. The plaintiff in Ziza underwent surgery for the implantation of a spinal cord stimulator. She received a $200,000 award. There apparently was a lost wage claim in that case as well, but we assume from the judge's remand decision that the jury was only asked to provide a single verdict for all the components of that plaintiff's injuries. Ziza's husband received a per quod award of $25,000.
From what the trial judge has said about these cases there are obvious significant differences. Only Morales dealt with a herniated disc (and not, as here, four herniated discs) and that case generated a verdict less than two percent of the amount to which the trial judge remitted the pain-and-suffering verdict in the case at hand. The Ziza case involved injuries that required spinal surgery, but it also involved an injured ankle and the verdict apparently lumped all the elements of damages together. The plaintiff in Ziza was fifty-five years old; plaintiff here was forty-six years old at the time of trial.
The judge also referred to verdicts in other cases where the plaintiffs sustained spinal injuries: in Astarita, plaintiff sustained two herniated discs, underwent a laminotomy, and was awarded $200,000; in Regan, plaintiff sustained two herniated discs, was treated conservatively, and awarded $150,000; in Shamosh, plaintiff sustained two disc herniations, underwent decompression surgery and was awarded $50,000; in Fernandez, plaintiff sustained three herniated discs and one disc bulge, and was awarded $100,000; in Hossain, plaintiff sustained one herniated disc and was awarded $50,000; in Boghdady, the plaintiff sustained three herniated discs and one disc bulge, and was awarded $40,000.
These cases provide some superficial support for the judge's conclusion, but what the judge has said about these cases reveals little about those particular plaintiffs and their own unique lives. The judge's discussion of those cases does not inform us of the plaintiffs' ages or how their particular injuriesundoubtedly similar to plaintiff's injuries hereimpacted upon their lives. In other words, it may be fair to compare the injuries sustained by plaintiff with the injuries sustained by these other plaintiffs but we question how can it be said without more that the pain and suffering of those others, as well as the way in which their enjoyment of life was lost or impaired, is sufficiently similar to warrant comparison.
Comparing the injuries sustained by individuals is not the same as comparing damages to automobiles. If a jury was asked to determine the value of a 2004 Ford Focus, which was totaled in an accident, it could safely consider the value of any other 2004 Ford Focus with similar mileage. But we are not dealing with the damage done to mechanical thingswe are dealing with human beings, all of whom are in many ways similar but in many ways different from all other human beings. We can generally predict, based on past experiences in similar cases, what a reasonable jury might award for a particular type of injury, but we should not expect that all juries ought to produce the same or similar verdict. The task of a jury in such a matter is to resolve complex issues regarding the monetary value of a particular person's pain and suffering and *1174 loss of the enjoyment of life. In examining such verdicts for excessiveness, courts should not expect or require the type of exactitude that seems to form the basis for the judge's decision in this case.
Given very limited information from the trial judge as to the facts and circumstances of these purported comparable verdicts,[3] we reject the notion that they provide adequate support for the judge's finding of excessiveness.[4]

C
In his decision following the Supreme Court's summary order in this matter, the trial judge also referred to his "feel of the case" in concluding that the pain and suffering and per quod awards were excessive. In this respect, the judge relied upon his observations of plaintiff during the course of the four-day trial, noting that she
was able to sit for long periods of time without any visible signs of pain or discomfort. She was able to enter and exit the courtroom without assistance or any apparent difficulty. Plaintiff's gait and appearance did not appear to be in any way affected by her injuries. Overall, there were no outward signs of pain or discomfort observable during the course of the trial.
The judge also sought to minimize plaintiff's injuries by referring to the facts that: plaintiff's treating doctors did not recommend surgery; "there was undisputed evidence of degenerative disc disease which preexisted the accident"; and, although she claimed a significant limitation in her daily activities, plaintiff "is able to care for herself, continues to perform light cleaning work, and is able to drive a motor vehicle."
We emphasize that the trial judge is not "a thirteenth and decisive juror," and "may not substitute his judgment for that of the jury." Johnson, supra, 192 N.J. at 281, 927 A.2d 1269 (quoting Baxter, supra, 74 N.J. at 598, 379 A.2d 225). We pay deference to the trial judge's "feel of the case" mainly because a judge's observations are helpful in understanding a jury's findings. Those observations are not, however, to supplant the jury's findings when the evidenceviewed in the light most favorable to plaintiff indicates the jury possessed a different view of the case. Ibid.; Taweel, supra, 58 N.J. at 236, 276 A.2d 861. Indeed, as the Court held in Baxter, a trial judge's "feel of the case" is entitled to "minimal" weight when based on things observed by the jury. Baxter, supra, 74 N.J. at 600, 379 A.2d 225.
Here, it is interesting to observe that the trial judge found nothing excessive or shocking about the jury's award of future lost wages of $500,000. We gather from the jury's verdict on that aspect of damages, and the judge's finding that it was not excessive, that the jury foundas was its rightthat plaintiff would remain permanently unable to return to work. The judge also determined, in amplifying his *1175 initial decision prior to our earlier opinion, that "there is an interrelationship between the pain and suffering and per quod damage awards and the lost wage awards." That being the case, we find incongruous the judge's determination that the pain and suffering awardalthough, as the judge held, not "fairly separable" from the lost wage awardwas excessive whereas the lost wage award was not. In our earlier opinion, we provided the following comments, which remain applicable:
[W]hile the factors upon which the court focused led it to conclude the pain and suffering and per quod awards were excessive, those same factors apparently did not lead the court to conclude that the jury's verdict relative to past and future lost wages was excessive. At their core, past and future loss of wages requires proof that plaintiff's injuries are causally related to plaintiff's inability to engage in her pre-accident employment responsibilities. Thus, plaintiff's inability to work is inextricably linked to the nature of injuries and the effect those injuries have upon continued employment. Consequently, we find it difficult to understand that the court could accept the jury's award for past and future lost earnings but not its award for pain and suffering and the per quod verdict.
[2009 WL 790940 at *8.]
In carefully examining the record on appeal, we conclude that the judge mistakenly failed to appreciate that the jury's view of the casethat is, the jury's findings regarding plaintiff's injuries, the duration and intensity of her pain and suffering, and the impact those injuries and the consequent pain had on her enjoyment of lifediffered substantially from his own. While the judge determined from his own observations of plaintiff in the courtroom that she did not appear to be as limited as claimed, the jury had the same opportunity to observe plaintiff and clearly found otherwise. And the judge, in his initial oral decision, concluded from his view of the evidence that plaintiff "has degenerative disk [sic] disease." Although plaintiff's expert indicated that the MRI studies revealed "degenerative problems" in places along her spine, that expert rejected the assertion that the herniated discs were causally related to any degenerative problems due to age. Again, in light of the jury's entire verdict, including those aspects the judge found were not excessive, we must assume the jury found plaintiff's expert credible. In exalting these "degenerative problems," as a means for minimizing the extent of plaintiff's pain and suffering, the judge failed to view the evidence "in a light most favorable to the plaintiff." Jastram, supra, 197 N.J. at 229, 962 A.2d 503. In concluding as we must that the jury found persuasive all aspects of plaintiff's claim, including the intensity and chronicity of her pain, the permanency of her injuries, and the severe blow these injuries dealt to her enjoyment of life, we reject the judge's own personal view of the evidence as an appropriate yardstick by which to measure defendant's claim of excessiveness.[5]

V
To summarize, we have reconsidered the matter in light of the judge's *1176 written decision following the Supreme Court's remand. We conclude that the judge's additional findings regarding comparable verdicts and his "feel of the case" are inconsistent with the principles set forth in Johnson, supra, 192 N.J. at 281, 927 A.2d 1269. Moreover, the findings are plainly insufficient to establish that the verdict constituted the manifest denial of justice required to overthrow the jury's determination. See Baxter, supra, 74 N.J. at 597-98, 379 A.2d 225.
In the final analysis, we find the trial judge's decision to be erroneous because he viewed as excessive a verdict that did not meet his vision of what lawyers or insurance adjusters might expect a jury to award to a plaintiff who has suffered certain injuries. In reversing, we can assumealthough we think he was more conservative than warrantedthat the judge was correct when he estimated the likely range of pain-and-suffering verdicts to be $40,000 to $200,000 in cases involving these types of injuries, treated in a similar way and with similar results. Finding such a range and ascertaining whether the verdict fell outside its borders, however, is not determinative of whether an award is excessive. It would indeed be strange if the law required that we instruct juries that there is no yardstick against which to measure a proper award of damages and then permit trial judges to use such a yardstick to determine excessiveness. Instead, determining what might be a predictable award in a particular case is only a starting point in such an analysis.
That is, verdicts that fall outside a predictable range are not per se excessive. For example, in Jastram, supra, 197 N.J. at 235, 962 A.2d 503, the Court reinstated a jury verdict, stating: "To be sure ... this was a high verdict, but that does not mean it was excessive." Likewise, in Johnson, supra, 192 N.J. at 283, 927 A.2d 1269, the Court found a jury's award to be "undoubtedly high, perhaps overly generous," but concluded it was not "so grossly excessive that it shocks the conscience." In short, it is a mistake to conclude that a verdict is excessive and shocking because it was greater than what an experienced practitioner or judge might expect in similar circumstances. The question is not whether the verdict "missed the mark" but whether it was "wide of the mark." When the predictable range for the damages in a case has been exceededeven when "high" or "overly generous"the verdict must still be sustained unless it can be held and adequately articulated that the award was "so grossly excessive" as to permit a conclusionclearly and convincingly reachedthat permitting the award to stand would constitute a manifest miscarriage of justice. Id. at 281, 927 A.2d 1269.
Having reexamined the matter in light of the trial judge's additional findings, we again recognize that this is a close case. It is not unreasonable to conclude that the pain and suffering award missed the mark. It may even lie around the edges of what might constitute a grossly excessive award. But, as our Supreme Court has said, a "tie must go to the jury," id. at 283, 927 A.2d 1269, because "[i]n the American system of justice the presumption of correctness of a verdict by a jury has behind it the wisdom of centuries of common law merged into our constitutional framework," ibid. (quoting Baxter, supra, 74 N.J. at 598, 379 A.2d 225).
The order under review is reversed and the matter remanded for reinstatement of the jury's verdict. We do not retain jurisdiction.
NOTES
[1] Defendant Randy Miller was the owner of the vehicle driven by defendant. The claims against him were dismissed with prejudice prior to trial.
[2] The trial judge never considered comparable verdicts in the original decision or the amplification he provided at the time we granted leave to appeal.
[3] The trial judge recognized this, commenting in his written opinion that he was "only provided with limited factual details" concerning these purported comparables.
[4] We also have concerns about what might constitute a fair procedure when a trial judge relies upon other jury verdicts and experiences that lie outside the record. We do not suggest any formal or lengthy procedures, but certainlyno matter how informala party should be given notice and a fair opportunity to be heard when a trial judge intends to rely upon comparable jury verdicts. We do not suggest that occurred here and, in light of our disposition of this appeal, we need not attempt to outline the procedures necessary to satisfy the requirements of due process in such a setting.
[5] We discern from the trial judge's reasoning that in invoking his "feel of the case" the judge relied exclusively on his visceral reaction to the amount of the verdict. The judge did not refer to any deficiency in the record that would reach the level of "wrongness" required. See State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). So long as there is reasonable support in the record, as here, a verdict may not be disturbed because of the trial judge's own personal analysis of the weight of the evidence.